**RAILWAY & EXPRESS CO. v. UNITED STATES.**

No. K–158.

Court of Claims.
March 7, 1932.

This suit is for the recovery of $183,235.-45, with interest as provided by law, representing income tax alleged to have been erroneously and illegally collected in the amounts of $90,647.29 for 1920 and $92,588.-16 for 1921.

The first question is whether the plaintiff was entitled in 1920 and in 1921 to credits of $802,906.40 and $228,426.94, respectively, for the purposes of the normal tax equal to the amount received as interest upon obligations of the United States which was included in gross income. Plaintiff carried on its operations during these years under a certain contract with the Director General of Railroads. The Commissioner of Internal Revenue held, and the defendant here contends, that the government securities, upon which this interest was received, were purchased with money belonging to the United States.

The second question concerns invested capital for 1921. The property of other express companies carrying on an express transportation business within the United States was paid in to the plaintiff July 1, 1918, for plaintiff's stock; its actual value being fixed and approved by the Director General of Railroads at $31,642,109.64 and the property entered upon the plaintiff's books at that figure. The Commissioner of Internal Revenue held, and the defendant here contends, that this valuation was as of November 30, 1917, and, without any examination or investigation of the amount or value of the property when it was actually transferred to the plaintiff July 1, 1918, reduced the amount included in invested capital by $1,199,720.12 alleged to represent depreciation during the seven months intervening between November 30, 1917, and July 1, 1918.

The third question is with reference to the inclusion in invested capital of certain stock issued by plaintiff to the Adams Express Company, denominated qualified capital stock, in the amount of $1,594,000. The Commissioner of Internal Revenue decided that this stock was not issued for cash or property, and excluded the amount thereof from invested capital for 1921. The plaintiff claims this stock was issued for value residing in miscellaneous equipment acquired from the Adams-Southern Express Company. It charged the amount of this stock to miscellaneous equipment, and included it in invested capital at its organization, and in computing net income for 1920 and 1921 charged against income in each of those years

$159,399.96 as exhaustion, wear, and tear of property on account of this item, representing 10 per cent. of the total amount on the basis of a ten-year life for the miscellaneous equipment acquired for such stock. The Commissioner of Internal Revenue denied these deductions to the extent of $53,133.38 for 1920 and in the full amount for 1921, for the same reason that he refused to include the total amount in invested capital.

### Special Findings of Fact.

1. The plaintiff, a Delaware corporation known as the American Railway Express Company, was organized between June 21 and June 26, 1918, pursuant to an agreement between the United States, by the Director General of Railroads, and the Adams Express Company, American Express Company, Southern Express Company, and Wells-Fargo & Co., dated June 21, 1918. Its name was changed in 1929 to Railway & Express Company. For the purposes of this case, therefore, the plaintiff will hereinafter be referred to as the American Railway Express Company.

For many years prior to June 10, 1918, and until July 1, 1918, the express business in the United States was handled principally by the Adams, American, Southern, and Wells-Fargo & Co. Express Companies, such companies having contracts with most of the railroads and other transportation lines for the transportation of express matter on trains, and for the use of other facilities the Great Northern, the Northern, and the Western Express Companies were operating over those railroads in the Northwest. On June 10, 1918, the Adams Express Company, for and on behalf of itself and the Southern Express Company, the American Express Company, and Wells-Fargo & Co., entered into a written agreement by the terms of which it was agreed that they would form an express company to be known as the American Railway Express Company with an authorized capital stock of $40,000,000, the shares to be of a par value of $100 each, of which $33,000,000 should be fully paid. This agreement is in evidence as Exhibit F, and is made a part of this finding by reference. The purpose and object of the consolidation of these companies under the name of the American Railway Express Company were to bring the express business completely under the management of one organization, as the result of the control of the railroads by the United States. In order to carry out this purpose, these companies on June 12, 1918, leased the properties of the Great Northern, the Northern, and the Western Express Companies. Following this contract the plaintiff became duly organized during June, 1918, and, after July 1, 1918, carried on the express business of the United States, with its principal office at New York.

The board of directors or board of managers of the several companies duly adopted resolutions authorizing the respective presidents to transfer to the newly formed corporation all of the property and equipment of the company used in its business and the payment of a sufficient sum in cash to meet its subscription to the stock of the new company, as provided for in paragraph 2 of the joint agreement of June 10. All of the resolutions were of the same purport, and substantially similar in language. The following resolution adopted by the Adams Express Company June 6, 1918, is representative of them all:

"Resolved, That the president be, and he is hereby, authorized to transfer to the corporation to be formed pursuant to said contract all of the property and equipment of this company used in the operation of its domestic express business and a sufficient sum of cash to meet its subscription to the stock of said new company in the total amount of $7,919,510 (tentative); and be it further

"Resolved, That the president and secretary be, and they are hereby, authorized, upon the formation of said new company and the taking over by it of the domestic express business now conducted by this company, to cancel so far as possible the contracts now existing between this company and its railroad lines operated by the director general, and assign to said new express company all contracts with other railroads, and all contracts, leases, and other privileges, rights or benefits belonging to this company and used in the operation of its domestic express transportation business, and to make and execute good and sufficient deeds for all real estate belonging to this company and used by it in its said business, and to execute any and all other instruments and perform any and all other acts that may be necessary to carry into effect fully the purpose of said contract."

2. By the aforementioned agreement between the express companies it was contemplated and understood that qualified stock of the plaintiff of the par value of $1,594,000 should be issued to the Adams Express Company in addition to the ordinary capital stock issued to that company for its contribution of

cash and tangible property. This qualified stock was not to share in the distribution of dividends until after payment of 5 per cent. on the ordinary capital stock. It was also provided that the holder thereof should not participate in any distribution of assets in the event of liquidation of the new corporation within ten years from the commencement of the business, "unless and until the balance of the issued capital stock shall have received par value in such contribution." All of the properties of the old express companies were paid in to plaintiff on July 1, 1918, pursuant to the agreement mentioned and the agreement of June 26, 1918, between the Director General of Railroads and the plaintiff hereinafter mentioned in finding 3, and, thereafter, the plaintiff issued ordinary common stock to the old companies and the above qualified common stock to the Adams Express Company for the properties so paid in after the Director General of Railroads had investigated and determined the values of such properties paid in and had issued certificates authorizing plaintiff to issue stock therefor, as will be hereinafter specifically set forth. The capital stock of $1,594,000 issued to the Adams Express Company represented a part of the purchase price paid by the plaintiff for value in that amount residing in miscellaneous equipment paid in by the Adams-Southern Express Company in excess of the actual value for which ordinary common stock was issued. In 1919 this qualified stock was entered upon plaintiff's books as a charge to miscellaneous equipment account, from which the amount thereof was cleared or written off by monthly charges to operating expenses as exhaustion, wear, and tear of property over a period of ten years, being the useful life of the miscellaneous property acquired therefor.

3. June 21, 1918, the Director General of Railroads, acting for the United States, entered into an agreement with the Adams Express Company, American Express Company, Southern Express Company, and Wells-Fargo & Co., as follows:

"Whereas the President of the United States, on December 28, 1917, acting under the powers conferred on him by the Constitution and laws of the United States, including those conferred by section 1 of the act of Congress entitled 'An act making appropriations for the support of the Army for the fiscal year ending June 30, 1917, and for other purposes,' approved August 29, 1916, took possession and assumed control of certain railroads and systems of transportation,

and has since operated and controlled the same; and

"Whereas by a proclamation dated March 29, 1918, the President of the United States authorized William G. McAdoo, as Director General of Railroads, to make any and all contracts or agreements which in any way may be found necessary or expedient in connection with the Federal Control of systems of transportation, as fully in all respects as the President is authorized to do; and

"Whereas said railroads and systems of transportation, taken over as aforesaid, include various railroads theretofore operated by companies which had, by written contracts, agreed to furnish to the individual express companies aforesaid certain privileges, facilities, and transportation for the carrying on of the express transportation business of said express companies in the United States; and

"Whereas said railroad companies are now unable, and will hereafter be unable, except through the Director General, to perform said contracts so long as the railroad properties formerly operated by them, respectively, remain under Federal control; and

"Whereas the Director General has determined that in the public interest and in view of the necessities of the Government in time of war he should take over and conduct the express transportation service upon the railroads and systems of transportation under Federal control, and has, therefore, found it inexpedient to carry out and perform the individual contracts of such railroad companies with the several express companies aforesaid; and

"Whereas the Director General desires to secure the continuance of the trained forces of said express companies, so far as may be necessary, in said proposed express transportation business, to the end that the same may be conducted with the greatest possible efficiency; and

"Whereas said express companies are willing to aid in placing at the service of the Director General their operating property and trained forces upon reasonable terms; and

"Whereas the Director General is of the opinion that the express transportation business upon the railroads and systems of transportation under Federal control can be most efficiently carried on through the agency of a single corporation, which shall act as the

sole agent of the Government in conducting said business:

"Now, therefore, in consideration of the promises and of the covenants herein contained, the said parties have made the following agreement:

"First. That the express' companies, as soon as may be after the date hereof, shall cause to be organized a corporation for the purpose of carrying on for the Director General the express transportation business upon the railroads and systems of transportation under Federal control, and elsewhere as may be determined by the Director General, in connection with the express transportation business thereupon. Said corporation shall have a capital stock not exceeding forty million dollars ($40,000,000.00), and the shares shall be subscribed and purchased at par by the express companies before named.

"Second. The express companies shall sell, convey, set over, and transfer to the said new corporation all property owned and used by them, respectively, in carrying on their express transportation business in the United States, including supplies and materials on hand in the supply departments and at the various offices of said companies, but not including cash or treasury assets, the aggregate value of which property is estimated to be, as of· November 30, 1917, thirty million ($30,000,000.00) dollars.

"If during the period intervening between said date, November 30, 1917, and the taking over of the property of the said respective companies on July 1, 1918, any property or equipment shall have been purchased by any of the said express companies for use in their domestic express transportation business, said property shall be turned over to the said new corporation at cost less accrued depreciation. It is understood that said express companies are to transfer to the said new corporation as aforesaid all of their property ·aforesaid used and usable in the conduct of the express transportation business to be carried on as provided in this contract: Provided, however, That the said property.to be turned over to the said new corporation of the value stated above does not include the office building of the American Express Company at 65 Broadway, New York, the office building of the American Express Company at 23–29 West Monroe Street, Chicago, or the office building. of the Wells, Fargo Company on Sixth Street at Portland, Oregon. The new corporation shall be furnished cash by the express companies in a sufficient amount to constitute reasonable working capital. No shares of capital stock shall be issued except on payment therefor at par in cash; or its equivalent in· property at the fair market value thereof. No evidences of indebtedness except ordinary bank or commercial loans for current purposes shall be made or issued by the new corporation without the prior approval in writing of the Director General; nor shall any lien of any kind be placed by it upon any property of the new corporation without the prior approval in writing of the Director General. All loans shall be reported to the Director General as soon as made.

"Third. Within the limit herein fixed the stock issued by said new corporation shall be sufficient to pay at par for the property so transferred to it and to provide the cash necessary for working capital. The initial issue of the stock of said new corporation shall not be made until such issue shall have been approved in writing by the Director General. From time to time thereafter as additional funds may be necessary to purchase additional property or reimburse the company for additional property purchased or for working capital, additional stock may be issued by said new corporation, but no issue shall be made without the approval in writing of the Director General.

"Fourth. The express companies further agree that they will without additional compensation assign, transfer, and turn over to the said new corporation as of July 1, 1918, any and all leases, contracts, or agreements relating to their express transportation business in the United States, except contracts for express privileges with railroads or systems of transportation now under Federal control.

"As a condition of this agreement the Director General requires and the express companies consent that the several contracts of the express companies with the railroads ·and systems .of transportation taken 'over by the Government under the President's proclamation of December 26, 1917, shall be canceled and annulled from and after July 1, 1918, and the parties hereby agree to take all necessary and proper steps in due time to bring about such cancellation and annullment of such contracts, which cancellation and annullment shall not affect rights at that time accrued and unsatisfied.

"The express companies shall assign as far as possible all contracts with any rail, water, or electric lines not taken over by the Government 'to said new corporation and shall not engage in the express transporta-

tion business in the United States during the period of contract between the Director General and said new corporation, except upon the approval of the Director General or when necessary to carry out a contract with a line not taken over by the Government and which they are unable to assign or cancel.

"The said express companies severally agree that they will make no claim for damages against the Government or any railroad company on account of the cancellation of any contract with any railroad or system of transportation taken under Federal control.

"Fifth. Said express companies also agree that they will assent to, and, so far as they can, promote the employment by said new corporation of such of their officers, agents, and employees as may be necessary to the carrying on by it of said express transportation business aforesaid.

"Sixth. The Director General agrees that upon the organization of the said new corporation he will enter into a contract with said new corporation upon the terms and conditions set forth in Exhibit A attached hereto and made a part hereof.

"Seventh. The said express companies may employ the said new corporation during the period of said contract as the agent of said express companies in their foreign business and for the handling of money orders and other financial paper and for such other purposes as may be desired, unless in the judgment of the Director General the express transportation business conducted by said new corporation will be prejudiced thereby. Said express companies shall pay to said new corporation such compensation for its services as shall be agreed upon between the parties from time to time as fair and reasonable, which compensation shall be considered as a part of the gross contract income of said new corporation. The Director General, however, may require said contracts to be submitted to him for his approval, and no contract disapproved by him shall thereafter be effective between the parties.

"Eighth. The express companies shall have the right to employ the new corporation as their agent to close out all unfinished express transportation business of such express companies transacted prior to July 1, 1918, upon such reimbursement of said new corporation of any out-of-pocket cost, as may be agreed upon between the parties, subject to the approval of the Director General, and the new corporation shall until March 31, 1919, take charge of and from time to time, as requested by said express companies, deliver to them at such points as may be designated by the express companies such of their books, records, and papers as may not be necessary for the business of the new corporation.

"Ninth. It is the intention that the provision herein made for carrying on the express transportation business through the agency of a single corporation shall continue in effect only during the period of Federal control, and nothing herein contained shall be construed as sanctioning any combination or merger of the properties or businesses of the express companies to last beyond that period.

"Wherefore it is agreed that the express companies shall maintain their independent corporate existence, and that upon the termination of Federal control the property herein agreed to be conveyed by each of them to the new corporation (or the equivalent of such property) shall be reconveyed to it by the new corporation (back to them) at a valuation to be agreed upon or in the event of disagreement to be fixed by the Interstate Commerce Commission.

"Tenth. Any controversy which may arise as to the performance of any part of this contract shall be submitted to and determined by the Interstate Commerce Commission and its decision thereon shall be final.

"Eleventh. The words 'Director General' as used herein shall be taken to apply to any official or person who may now exercise the authority of the United States with respect to said lines of railroad under Federal control, or may hereafter, as the successor of the Director General, exercise such authority.

"The word 'railroad' as used herein shall include all systems of transportation and appurtenances thereto under Federal control covered by this contract.

"The words 'capital stock' or 'outstanding capital stock' as used herein shall mean and include only stock issued by the new corporation upon the approval of the Director General and not canceled."

Plaintiff company was duly organized prior to June 26, 1918, and on that date the Director General of Railroads and the plaintiff entered into a written agreement, as follows:

"Witnesseth:

"That for and in consideration of the mutual covenants, separate services, and payments hereinafter recited to be by the parties kept, performed, and made, the parties do hereby agree as follows:

"1. That in the interest of greater efficiency in express service and effecting economies in operating expenses of both the railroads under Federal control and the express company the Director General hereby employs the express company as the sole agent of the Government under the supervision of the Director General of Railroads to conduct the express transportation business upon all lines of railroads under Federal control and upon such other systems of transportation or parts thereof as in the judgment of the Director General it may be necessary or desirable to include.

"2. This contract shall take effect on July 1, 1918, and shall continue during the full period of Federal control as that period is limited by section 14 of 'An act to provide for the operation of transportation systems, while under Federal control, for the just compensation of their owners, and for other purposes,' approved March 21, 1918.

"3. The express transportation business to be carried on under this contract is understood to mean such transportation business as is commonly carried on by express companies at the present time, or as may be carried on by them, during the continuance of this contract, and for the purpose of this contract it is agreed that the express business contemplated by this contract shall include all matter carried on passenger, express, or mail trains of the railroads, except baggage of passengers and theatrical scenery and belongings when checked on regular transportation, United States and railroad mail, including parcel-post matter, corpses when accompanied by some one in charge, news trunks and property necessary to carry on the usual news business, goods and material for the use of the railroads, and supplies for railroad eating houses and dining cars. The Director General as well as the express company shall have the right to carry on such trains freight from the Orient imported by coast ports, newspapers, milk, and cream and returned empties: Provided, however, That nothing in this agreement shall prevent the Director General from transporting horses, carriages, or cattle or other classes of freight upon passenger trains when necessary in emergencies to avoid delay to freight shipments; and provided further, that no explosives, inflammable articles, or acids shall be considered express traffic except such as it may be lawful to transport on passenger trains when properly packed, marked, and certified to as required by the regulations of the Interstate Commerce Commission or other public authority for the transportation of explosives,

by the rules of the American Railway Association, and such regulations for the transportation of inflammable articles and acids as may be fixed by the Director General. The maximum weight to be carried in any of the cars carrying express business shall not exceed a limit which in the judgment of the Director General is necessary for safety. Articles which can only be loaded and unloaded through end doors of express or baggage cars causing delays to passenger trains in switching for this purpose shall not be accepted by the express company unless a special car is furnished and charged for at the carload rate, and the express company shall not accept shipments which can not be so handled as to avoid unusual delays to the trains of the Government.

"Said express transportation business shall be conducted under such rates, charges, classifications, regulations, and practices as are now or may hereafter be lawfully established. The Director General shall take all steps lawfully necessary to make any change in such rates, charges, classifications, regulations, and practices. The express company shall propose no reduction in rates or charges without the prior approval of such reduction by the Director General. The express company shall solicit no express shipments disapproved by the Director General.

"4. The Director General shall furnish adequate and suitable space in cars properly equipped, heated, lighted, and lettered American Railway Express Company of the kind customarily furnished by railroad companies for the use of express companies on such passenger, mail, and express trains as may be designated from time to time by the Director General over each of the lines of railroad covered by this contract for the transportation and proper handling en route of all express matter tendered by the express company at any station at which said trains make regular stops and shall carry such express matter and the safes, packing trunks, supplies, and equipment of the express company, together with the messengers, helpers, and guards of the express company necessary for the handling and protection of such express matter to destination or the proper transfer points on said railroads. The Director General shall, so far as it can conveniently be done without interfering with his business, permit the express company to use a portion of station buildings on the lines covered by this agreement without charge therefor for the reception, loading and unloading, safekeeping, and delivery of express matter carried under this agreement. Where special

services or facilities have been furnished upon payments by the express companies in addition to the percentage of gross earnings both parties hereto shall have the benefit of such arrangements until otherwise determined by the Director General or by the express company after notice and hearing. The movement of express shall be under the control of the Director General at all times and transported over such lines of railroad and on such trains as he may direct in the interest of economy in car service by utilizing available space and with proper regard for the necessity of prompt movement.

"5. Said express company shall use its teams, property, offices, and other facilities, and its agents and employees in operating an express transportation business on all the lines of railroad under Federal control, and upon such other systems of transportation, or parts thereof, as in the judgment of the Director General it may be necessary or desirable to include; and in the conduct of said business will exert itself in all proper ways to make said business satisfactory to the public and to the Director General. All contracts between the express company and railroads and systems of transportation not under Federal control shall be subject to the approval of the Director General.

"6. The express company shall be liable for all loss or damage to the facilities furnished by the Director General to the express company for use in the express transportation business caused by the express company, its agents, or employees.

"As between the Director General and the express company the express company shall be liable for any and all claims on account of loss, damage, or delay to its own property or the property of others in its charge carried under the provisions of this contract, and it shall assume all risk of injury or death to its agents or employees while engaged in its business on any of the lines or premises covered by this contract; and shall indemnify and save harmless the Director General or any agent or employee of the Director General, including any railway company engaged in the operation of any railroad under Federal control covered by this contract, and the employees of any such company, against all claims, demands, suits, and actions whatsoever that may be begun against any of the same on account of any claim arising or growing out of the undertaking so above assumed whether in law or in equity or before any compensation board, tribunal, or court whatsoever; and any amounts paid hereunder shall be charged to operating expenses.

"7. In any action at law or in equity or other proceeding brought against said express company before any compensation board, court, or other tribunal it will make no defense, except with the approval of the Director General, upon the ground that it is by virtue of this contract an instrumentality or agency of the Federal Government; nor will it seek to transfer to a Federal court any such action brought against it in any State court upon the like ground except with the approval of the Director General. Any and all other legal rights of the express company except as above limited are expressly reserved.

"8. From the gross revenue earned on the transportation by the express company of all the express traffic on all lines under Federal control covered by this contract, under such rates, charges, and classifications as shall be in force, it shall pay to the Director General 50.25 per cent.

"To the balance of the revenues thus remaining there shall be added the following:

"Gross revenue derived from express transportation operations over any lines not under Federal control, less payments to such lines under contracts in force with them; all miscellaneous income derived from express operations, including rentals, compensation received for the sales of money orders or other financial paper, charges assessed in addition to transportation charges, such as value charges, and income from money or securities invested in the dividend guaranty fund as described in paragraph 4 of this section. The resulting total shall be known as 'Gross contract income.'

"From the gross contract income as here defined, the express company shall defray the operating expenses, rentals, taxes, except war taxes, and any other proper expenditures not disapproved by the Director General incurred in express operations, the remainder being termed 'Contract income for division.' The term 'Operating expenses,' as herein used, shall embrace all items prescribed by the Interstate Commerce Commission's classification of express accounts as operating expenses for express companies.

"From the contract income for division, an amount equal to 5 per cent. of the total par value of the outstanding capital stock of the express company shall first be set apart for the payment of dividends or general corporate purposes, herein termed 'Primary allowance,' which shall be cumulative. Any excess of contract income for division over said primary allowance, up to 2 per cent. of

the par value of the capital stock of the express company, shall be divided one-half to the said company to be set apart for dividends or general corporate purposes, and one-half to the Director General. The remainder to the extent necessary shall be paid into a guaranty fund, which fund shall not at any time exceed an amount equivalent to 10 per cent. of the total par value of the outstanding capital stock. This fund shall be held by the express company to insure its ability to pay for each year during the life of this contract an amount equal to 5 per cent. upon the total par value of its capital stock from July 1, 1918. Any earnings from such fund shall be considered as contract income for division.

"If the contract income for division in any year shall not be equal to five per cent. of the capital stock as herein provided, any amount lacking shall be withdrawn from said guaranty fund to supply such deficiency to the extent that said fund is sufficient for that purpose, and the said fund shall thereafter be restored from the contract income for division after deducting the five per cent. primary allowances and the next two (2) per cent. as hereinbefore provided, in the same manner as the fund was originally' created: Provided, That should there not be a sufficient sum in said guaranty fund to furnish the amount necessary to pay said primary allowance at any time, the said deficiency shall be paid from said fund when there shall be sufficient money therein.

, "Any amount in said guaranty fund at the termination of this contract, or that may be due thereto and not required for the purpose for which the fund was established, shall be divided between the express company and the Director General in the proportion of forty per cent. to said express company and sixty per cent. to the Director General.

"After the accumulation of the guaranty fund, any contract income for division in excess of the said five per cent. primary allowance and the said two (2) per cent. hereinbefore provided shall be divided as follows:

"The next three (3) per cent. upon the total par value of said capital stock in the proportion of one-third to said company and two-thirds to the Director General, and any sum beyond that amount in proportion of one-fourth to said company and three-fourths to the Director General.

"It is the understanding and agreement of the parties that the 'contract income for division' is not the income or property of the express company but is a fund resulting from the terms of this agreement in which the Director General and the express company have a mutual interest. The express company has no right to any portion of this fund except that which it finally retains under the terms of this agreement and which is the compensation paid it by the Director General for the performance of its service as the agent of the Director General in the transaction of this express business. Only that portion of the fund belonging to the express company shall be included in the net income of the express company for taxation under titles 1 and 2 of an act entitled 'An act to provide revenue to defray war expenses, and for other purposes,' approved October 3, 1917, or any act in addition thereto or any amendment thereof or any supplements thereto. If the express company shall be required to pay said war taxes upon any part of the contract income for division belonging to the Director General, the Director General shall and does hereby indemnify and save harmless the express company against any payments that may hereafter be demanded of or imposed upon said express company on account of taxes that may be levied under titles 1 and 2 of said act upon that part of the said contract income for division paid or credited to the Director General hereunder.

"The term 'Revenues earned,' as used herein, is intended to mean the amount of revenue earned for the service performed, less any sums subsequently determined to be uncollectible.

"9. The express company shall, within sixty (60) days after the end of each calendar month, pay to the Director General a sum of money equivalent as nearly as may be to the percentage of gross revenues earned in such month provided for in the first paragraph of Section VIII; within sixty (60) days after June 30th and December 31st of each year the express company shall render to the Director General a statement in such form and detail as he shall require, showing the gross revenues earned in said six (6) months' period ending with June 30th and December 31st, and within ten (10) days thereafter it shall pay to the Director General the balance, if any, due to the Director General under the first paragraph of Section VIII.

"Within ninety (90) days after the end of each calendar year or the termination of Federal control said express company shall render to the Director General a statement in

such form and detail as he shall require, showing the results of operation of said express company under this contract in a year, or part thereof, determined as hereinbefore provided, and within ten (10) days after the rendition of said statement, shall pay to the Director General whatever sum shall be due to him under this contract.

"10. The salaries paid by the express company to its officers shall be reasonable. All salaries in excess of $10,000 a year shall be reported to the Director General. If he shall determine that any such salary is unreasonable and shall notify the express company in writing the maximum salary which he regards as reasonable, any amount in excess of such maximum salary so fixed which shall be paid to such officer for salary after the giving of such notice shall be excluded from any accounts of the express company used in determining the contract income for division.

"11. The accounts of the express company shall be kept in form and manner prescribed by the Interstate Commerce Commission and the Government shall have the right to inspect such accounts at any and all reasonable times through its duly authorized agents; but the express company shall not be required to apportion its earnings among the various individual railroad lines and systems or to ascertain the earnings accruing on any individual railroad line under Federal control, and the Director General may from time to time require the express company to furnish such statistics or special statement as may be reasonably necessary in connection with the operations under this contract.

"12. The Director General shall have the right to require the transportation without charge by the express company over any and all lines of railroad under Federal control of all packages of money, valuables, papers, and shipments of materials and supplies ordinarily forwarded by express, used in the operation of any of the railroads under Federal control: Provided, however, That the express company shall not be liable for any loss or injury of said shipments so carried unless caused by the theft, dishonesty, or carelessness of the employees of the express company. When the express company and the railroad under Federal control employ the same agents, the receipt of the express messenger on the train for railway property shall constitute a delivery to the express company and the receipt of the party to whom the packages may be addressed or his representative shall constitute a delivery by the express company.

"13. The Director General will transport upon the passenger and express trains of the lines covered by this contract free of charge, on passes to be issued by the Director General or proper railway official on proper application therefor, the officers, agents, and employees of the express company when traveling in the interest of or upon the business of said express company. He will also transport free of charge upon the freight trains of the lines covered by this contract the equipment and materials of the express company required for use by it on the lines covered by this contract, but no hay, grain, or other feed stuffs shall be so transported for more than 500 miles. He will also transport free of charge equipment, stationery, and office supplies of the express company in cars or parts of cars set apart for the use of the express company. The express company assumes the risk of loss or damage resulting from all such transportation and agrees to indemnify and save harmless the Director General or any individual railroad under Federal control covered by this contract involved therein from all claims for loss or damages arising from such transportation.

"14. The Director General will transmit for the express company, free of charge, over all telegraph or telephone of individual railroads or railroad systems lines operated as a part of said lines of railroad under Federal control covered by this contract, all business messages relating to the express transportation business of such railroads or railroad systems to be conducted by said express company: Provided, however, That the express company releases and holds harmless the Director General or any railroad company from all liabilities arising from any error or delay in the transmission of such messages or from failure to forward and deliver the same.

"15. The Director General may employ any of the employees of the express company upon such reasonable terms as shall be agreed upon between the parties, and the express company may employ such employees of the Director General or agents of the railroads, and upon such terms as may be agreed upon from time to time by the Director General and the express company. Where station agents of the Director General or of the railroad are employed by the express company, the Director General shall pay such agents the entire compensation for their services to the Director General, the railroads, and the express company, and no payment shall be made direct by the express company to any such agent whose services may be so furnish-

ed by the Director General. The express company shall pay to the Director General the usual commissions heretofore paid upon express transportation business at stations where such station agents are joint agents as its share of the agent's compensation.

"Liability for personal injury or death of any joint employee, when it can be determined that such injury or death was sustained while the employee was engaged exclusively in express service, will be borne by the express company, and the express company will bear all costs and expenses incident to the settlement thereof. When it can be determined that such injury or death was sustained while the employee was engaged exclusively in railroad service, the Director General will bear all costs and expenses incident to the settlement thereof. Where the cause or causes of such injury or death can not be determined the express company and the Director General will bear the same in the proportion in which the wages paid by each bear to the total compensation, in which latter case no settlement shall be made by either party without the consent of the other.

"16. When cars other than the regular equipment assigned for express traffic are requested by the express company in order to carry shipments of an unusual character, and such cars are furnished by the Director General, said express company shall pay the expense of fitting up such cars for its use and of restoring the same to their normal conditions thereafter, the reasonable compensation therefor to be determined by the Director General.

"17. The express company will load and unload its express matter, or require the shippers and consignees to do so, upon or from all cars assigned regularly or specially to express transportation traffic.

"18. All of the agents and employees of the express company while on the premises or on lines of railroad under Federal control covered by this contract shall at all times conform to the general rules in force thereon, and in case any messenger or other employee on any said line shall from any cause be objectionable to the Director General he shall be removed or discharged upon the written request of the Director General or of the Director General's principal operating representative on such line.

"19. The Director General shall allow the express company the usual mileage rates on all cars belonging to the express company and used in handling the business under this contract over the railroad lines operated and controlled by the Director General. The mileage compensation allowed by the Director General to the express company shall be considered a part of the gross contract income of the express company.

"20. The express company will take over and continue the payment of pensions to former employees of the several express companies, which employees have heretofore been pensioned under their rules, but no such pension shall exceed one hundred and twenty-five ($125.00) dollars per month. The officers and employees of the several express companies who may be employed by the express company shall retain the same rights to pension from said new corporation as they have at the time of change in employment. The plan and pension rules of the express company shall be submitted to the Director General and if disapproved by him in any particular shall not become effective until so modified as to meet his approval; the sums paid on account of such pensions shall be charged to operating expenses.

"21. The express company will enter into a contract with the express companies parties to memorandum of agreement with the United States, dated June 21, 1918, for the period of this contract as the agent of said express companies in their foreign business and for the handling of money orders and other financial paper, and for such other purposes as may be desired, unless in the judgment of the Director General the express transportation business conducted by said express company will be prejudiced thereby. The express company shall be paid by said express companies such compensation for its services as shall be agreed upon between the parties from time to time as fair and reasonable, which compensation shall be considered as a part of the gross contract income of the express company. The Director General, however, may require said contract to be submitted to him for his approval, and no contract disapproved by him shall thereafter be effective between the parties.

"22. The Director General will perform all necessary switching service for cars in express service on the lines under Federal control covered by this contract, such as ordinary switching in connection with regular trains at stations which involves movement to and from the stations, and also to and from a track or siding assigned for the handling of express traffic and interchange of cars between railroads over which the express company operates, and cars loaded with livestock in transit to and from stockyards for

feed, water, and rest, in compliance with the law and service necessary by reason of the failure of the railroads to make schedule connection. For unusual or extraordinary service rendered such as special switching to and from industry tracks or occasioned by reconsignment of cars and service of like nature, the express company shall pay compensation at the rate or charge of the railroads made for similar services to other parties.

"23. The express company agrees that the icing and refrigeration of cars in the service of the express company while on the lines covered by this contract shall be performed by the agency employed by the Director General for this purpose, the Director General agreeing that the charges for such service shall be reasonable.

"24. No evidences of indebtedness except ordinary bank or commercial loans for current purposes shall be made or issued by the express company without the prior approval in writing of the Director General; nor shall any lien of any kind be placed by it upon any property of the new corporation without the prior approval in writing of the Director General. All loans shall be reported to the Director General as soon as made.

"The stock issued by the express company shall be sufficient to pay at par for the property transferred to it and to provide the cash necessary for working capital. The initial issue of the stock of the express company shall not be made until such issue shall have been approved in writing by the Director General. From time to time thereafter as additional funds may be necessary to purchase additional property or reimburse the company for additional property purchased or for working capital, additional stock may be issued by the express company, but no issue shall be made without the approval in writing of the Director General.

"25. Either party to this contract may, after July 1, 1922, by not less than six months' notice in writing, to the other party, cancel this contract.

"26. The express company agrees that it will at any time during the existence of this contract, upon terms to be agreed upon between the parties hereto, establish at such places as may be designated by the Director General, collection and delivery service for baggage and less than carload shipments of freight.

"27. If during the operation under this contract the gross contract income hereunder for any contract year shall not be sufficient to pay the operating expense and taxes of the express company for such contract year, it is agreed that the amount of any such deficit shall be deducted from any payments due the Director General thereafter, as a further allowance by the Director General to the express company.

"28. Any controversy which may arise as to the performance of any part of this contract shall be submitted to and determined by the Interstate Commerce Commission after full hearing, and its decision thereon shall be final.

"29. The term 'capital stock' or 'outstanding capital stock,' as used herein, shall mean and include only stock issued by the express company upon the approval of the Director General and not canceled.

"The term 'Director General,' as used herein, shall be taken to apply to any official or person who may now exercise the authority of the United States with respect to said lines of railroad under Federal control, or may hereafter, as the successor of the Director General, exercise such authority.

"The word 'railroad,' as used herein, shall include all systems of transportation and appurtenances thereto under Federal control covered by this contract."

4. November 16, 1918, the President of the United States issued the following proclamation:

"Whereas the organizations for the conduct of the express business over numerous systems of transportation which have been duly placed under Federal control, and pertaining to such systems of transportation, have been consolidated into the American Railway Express Company which has been made the sole agent of the Government for conducting the express business, with the result that the entire transportation system of said express company has been necessarily in substance and effect placed under Federal control; and

"Whereas it is desirable, in order to administer to the best advantage the transportation business and operations of the American Railway Express system to make it specifically clear by this proclamation that the President has the possession, use, control and operation of the entire transportation system of the American Railway Express Company:

"Now, therefore, I, Woodrow Wilson, President of the United States, under and by virtue of the powers vested in me by law do hereby, through Newton D. Baker, Secretary of War, take possession, and assume

control at 12 o'clock noon on the 18th day of November, 1918, of that certain system of transportation called the American Railway Express Company and all of its appurtenances and property of every kind or nature, directly or indirectly owned, leased, chartered, controlled, or used in the conduct of, or in connection with, its express business.

"It is hereby further directed that the possession, control, operation, and utilization of said express transportation system hereby by me undertaken shall be exercised by and through William G. McAdoo, heretofore appointed Director General of Railroads, with all the powers conferred upon him by the said proclamations of December 26, 1917, and March 29, 1918, respectively, together with all and singular the powers conferred upon the President by the act of Congress entitled, 'an act to provide for the operation of transportation systems while under Federal control, for the just compensation of their owners, and for other purposes,' approved March 21, 1918.

"The said Director General of Railroads may perform the duties hereby imposed upon him, so long and to such an extent as he shall determine, through the board of directors, officers, and employees of the said American Railway Express Company, under the contract already made, and dated the twenty-sixth day of June, 1918, between the said Director General of Railroads and said American Railway Express Company, and until and except so far as said director general shall from time to time by general or special orders otherwise provide, the board of directors, officers, and employees of said company shall continue the operation thereof in the usual and ordinary course under such contract.

"From and after 12 o'clock noon on said 18th November, 1918, the said transportation system shall conclusively be deemed within the possession and control of said director general without further act or notice.

"In witness whereof I have hereunto set my hand and caused the seal of the United States to be affixed.

"Done by the President, through Newton D. Baker, Secretary of War, in the District of Columbia, this 16th day of November, in the year of our Lord one thousand nine hundred and eighteen, and of the independence of the United States the one hundred and forty-third."

5. November 21, 1918, the Director General of Railroads and the American Railway Express Company, plaintiff herein, entered into the following written agreement:

"First. That the said contract of June 26, 1918, is hereby adopted, ratified, and confirmed, and the express transportation business aforesaid is to be managed and conducted during the period of Federal control, under the terms of said contract, by the board of directors, officers, and employees of the said American Railway Express Company.

"Second. Nothing herein contained shall be construed as a waiver on the part of the Director General of Railroads of any right he may have to cancel said contract of June 26, 1918, but, in the event said contract be cancelled, said American Railway Express Company shall be fully and duly compensated according to law for the use of its property by the Government thereafter, and for any damage caused to or claimed by it by any cancellation not made under the terms of the contract.

"Third. The said contract of June 26, 1918, shall be deemed to fix according to law the compensation of said American Railway Express Company for such Federal control so long as the said agreement remains in force."

6. Upon organization of plaintiff the Adams Express Company, American Express Company, Southern Express Company, and Wells-Fargo & Co. paid in to the plaintiff all property owned and used by them and necessary in carrying on the express transportation business in the United States, including supplies and materials on hand in the supply department and at the various offices of said companies, but not including cash or treasury assets. Said companies further paid in to the plaintiff $3,000,000 in cash for its capital stock. Prior to the issuance and delivery by plaintiff of its capital stock for said properties and cash, and in accordance with the contracts of June 21 and June 26, 1918, the Director General of Railroads, acting for the United States through a representative of his office designated for that purpose, made a thorough investigation of the amount and actual value of property paid in to plaintiff. During the time that such investigation was under way the Director General, on February 7, 1919, issued a certificate, as provided in the agreements of June 21, 1918, between him and the several express companies and June 26, 1918, between him and the plaintiff, approving the issuance by plaintiff of its capital stock to an amount not exceeding $24,750,000.

Thereafter, on April 20, 1920, after com-

pletion of his investigation of the amount and actual value of the property paid in to the plaintiff, the Director General of Railroads issued a further certificate under the agreements mentioned approving the issuance by plaintiff of its capital stock to an amount not exceeding $9,892,109.64.

7. No officer or agent of the Treasury Department or the Bureau of Internal Revenue ever made any inspection of the plaintiff's physical assets, nor was any investigation made as to the amount and actual value thereof at the time paid in.

Capital stock in the amount of $3,000,000 was issued by plaintiff for cash in the amount of $906,300 paid in by the Adams-Southern Express Company, $1,131,300 by the American Express Company, and $962,400 by Wells-Fargo & Company.

Ordinary and qualified common capital stock of $31,642,000 was issued by plaintiff for property paid in to it, other than cash, as follows:

Adams-Southern Express Company..... $10,998,000.75
American Express Company............. 11,139,798.04
Wells-Fargo & Company................. 9,504,310.85
                                      _____
                                      $31,642,109.64

The odd amount of $109.64 was adjusted by paying cash to the subscribers of capital stock. The actual cash value of the physical properties paid in to the plaintiff by the express companies above mentioned was $31,-642,109.64 on July 1, 1918. On September 1, 1920, plaintiff entered into identical contracts with substantially all of the class I railroads of the United States for the conduct of express business over the lines of said railroads. One of these contracts is in evidence as Plaintiff's Exhibit 20, and is made a part hereof by reference. These contracts provide, among other things: "It is agreed that the value of the entire real property and equipment and other capital hereinabove referred to was on July 1, 1918, $34,642,109.64, that being the value fixed by the Director General of Railroads." By "the entire real property and equipment and other capital hereinabove referred to" is meant the entire real property and equipment and other capital of plaintiff employed in the express transportation business.

All of said stock so issued was ordinary common stock, except $1,594,000, known as qualified common stock, which, by agreement of the plaintiff with the American, Wells-Fargo, Adams, and Southern Express companies, was issued and delivered to the Adams Express Company.

This stock was issued for miscellaneous equipment, as aforesaid, and in its annual accounts the plaintiff charged to operating expenses and against income and credited to miscellaneous equipment such amounts which, if such charges were continued for ten years, would have extinguished the entire $1,594,000 included in miscellaneous equipment, as aforesaid.

8. Plaintiff carried on its operations and continued the express business of the United States over the railroads under federal control from July 1, 1918, to February 29, 1920, known as the federal control period under the contract with the Director General of Railroads. For the six months following federal control, March 1 to September 1, 1920, known as the guaranty period, plaintiff operated under the guaranty provisions of the Transportation Act of 1920, as contemplated in section 209 (i) of that act, 41 Stat. 456, 467. During the federal control and the guaranty periods the plaintiff's stockholders selected its directors and the directors selected its officers. The company's operations during federal control and the guaranty periods resulted in losses which were assumed by the Director General and the United States.

9. Plaintiff duly filed its return for 1920 disclosing a tax of $73,172.87, which was assessed and paid as hereinafter set forth.

10. June 15, 1922, it filed an amended return for 1920 showing a total tax liability for that year of $12,546.70.

Upon audit of these returns subsequent to the payment of the tax shown on the original return, the Commissioner of Internal Revenue determined an additional tax of $69,125.34, which, together with interest of $5,043.31, was duly paid by cash and a credit. The total tax of $142,298.21, and the interest above mentioned, was paid in five installments of $18,293.22 each on March 15, June 14, and September 14, 1921, $18,293.21 on December 14, 1921, and $74,168.65 on September 26, 1927.

11. Plaintiff filed its return for 1921 disclosing a tax of $265,195.06, which was assessed and paid except the amount of $60,-626.17 thereof, for which plaintiff filed a claim asking that this amount be credited against an alleged overpayment for 1920. This claim for credit was rejected, and the amount was paid as set forth below, with interest of $12,428.36. The total tax and interest of $277,623.42 for this year were paid in six installments of $50,560.03, $82,037.51, $5,672.59, $66,298.76, $60,626.17, and $12,-428.36 on March 15, June 15, September 19,

and December 18, 1922, and on October 23, 1926, and June 6, 1927, respectively.

The defendant determined an overpayment in tax of $8,503.84 for 1921, and on May 24, 1927, credited $6,743.86 to the tax for 1920, and on November 26, 1928, refunded the balance of $1,759.98.

Plaintiff filed waivers for the taxable years extending the limitation period for assessment and collection to December 31, 1927. It also duly filed claims for refund for the taxable years setting forth the grounds upon which this suit was based. These claims were disallowed by the Commissioner of Internal Revenue, except that the claim for 1921 was partially allowed as to items not here in question. This suit was instituted within two years after the claims were disallowed.

12. The original return for 1920 showed a net taxable income of $1,536,635.06 and the amended return for that year a net income of $930,373.39; the difference in the net income shown on these returns being the result of additional deductions from gross income for express privilege liability of $424,149 and other expenses of $182,112.67.

For the purpose of his final audit, the Commissioner used the net income shown in the amended return, and in computing the total tax made certain additions thereto including the items involved in this suit. He disallowed the item of express privilege liability claimed for 1920 and allowed it for 1921, permitting the additional expenses claimed in the amended return for 1920 to stand.

Plaintiff included in the gross income shown in the return for 1920 interest in the amount of $45,003.07 from funded securities, and $1,592.661.32 from unfunded securities and accounts, totaling $1,637,664.39. This interest was received from the following sources, as set out in said returns:

Interest on Liberty bonds:

| | | |
|---|---|---|
| First and second 4's and first, second, third, and fourth 4¼'s .............. | $ 44,275.78 | |
| Other obligations issued since September 1, 1917 (except Victory and Treasury notes) ........ | 758,630.62 | |
| | | $ 802,906.40 |

Other interest:

| | | |
|---|---|---|
| Bank balances ............ | 756,500.41 | |
| Bonds and mortgages..... | 720.00 | |
| Certificates of time deposit | 20,465.03 | |
| Miscellaneous ............ | 7.29 | |
| Call loans ................ | 57,065.26 | |
| | | 834,757.99 |
| Total interest ..................... | | $1,637,664.39 |

The above-mentioned sum of $802,906.40 was interest received by plaintiff upon obligations of the United States issued after September 1, 1917.

In computing the amount of net income for 1920 subject to tax the plaintiff, in Schedule D of its return for that year, took credit for taxable interest on obligations of the United States issued after September 1, 1917, in the above-mentioned amount of $802,906.40. The Commissioner of Internal Revenue disallowed this credit on the ground that the securities were purchased with funds belonging to the United States.

There was a charge against income in each of the years 1920 and 1921 of $159,399.96, being 10 per cent. of the total amount of $1,594,000, for which the qualified common stock was issued; the amount so charged being claimed as a depreciation deduction in the return for 1920. The Commissioner of Internal Revenue disallowed the deduction to the extent of $53,133.38, being that portion of such charge made in 1920 after September 1 of that year. This deduction was disallowed by the Commissioner of Internal Revenue on the ground that stock in that amount was issued to the Adams Express Company in excess of the value of the property and cash contributed, and was not, therefore, a proper deduction as an ordinary and necessary expense.

13. The return for 1921 stated a net taxable income of $3,094,931.28. Plaintiff included in gross income shown by this return the interest received during the year in the amount of $262,275.92 from funded securities and $1,376,828.30 from unfunded securities and accounts. This interest was received from the following sources:

| | | |
|---|---|---|
| First and second 4's and first, second, third and fourth 4½'s ........................ | $ 41,330.24 | |
| Other Government obligations issued since September 1, 1917 (except Victory and Treasury notes) ............ | 697,887.77 | |
| Victory Liberty loans 4¾% notes and Treasury notes... | 219,229.18 | |
| | | $ 958,447.19 |
| Bank balances ................ | 516,670.44 | |
| Bonds and mortgages......... | 1,716.50 | |
| Call loans ..................... | 162,270.09 | |
| | | 680,657.03 |
| | | $1,639,104.22 |

In arriving at the net income subject to income tax at 10 per cent., plaintiff, in Schedule D of its return for 1921, took a credit for taxable interest on obligations of the United States in the aforementioned amount of $958,447.19.

The Commissioner of Internal Revenue included the entire amount of interest received from obligations of the United States

in gross income, but allowed only $720,170.35 thereof as a credit in computing the net income subject to the normal tax. His reason for this action is stated in his letter to the plaintiff, as follows:

"The amount $958,447.19 claimed by you as tax exempt interest for the year 1921 is reduced by $238,276.84, the amount which you credited to the Director General as his share of interest. Since it has been held that the tax exempt securities on which $802,906.-40 was earned in 1920 were purchased with funds of, and belonged to, the Director General, and since his fund was still sufficient, it must be assumed that enough of the securities belonged to him in 1921 to produce the amount of income with which you credited his account, and that such amount should not be used to reduce your taxable income for the year."

14. During the federal control and guaranty periods plaintiff deducted certain sums from current receipts, and entered these amounts in its books as reserves to meet deferred liabilities of those periods. These reserves were merely book accounts and represented plaintiff's outstanding liabilities on account of operations during these periods. They produced no interest received by plaintiff. Said liabilities were not currently paid, and their amount was unknown and depended upon the adjudication of many claims. Plaintiff did not know to whom such liabilities were owing; if the claims against it were sustained, payment would be made to the claimants, otherwise the amount of the reserve would be credited to the Director General and the Treasury Department as an abatement of deficits charged to them, because said reserves were charged against income and were reflected in the deficits from operations which the Director General and the Treasury Department made good. No money or securities were set apart, or earmarked, by the company to meet these liabilities. The reserves were simply book accounts evidencing the liability of the company, and there was no segregation of the assets to meet such liabilities. The funds thus accumulated, for the reason that plaintiff did not, and necessarily could not, currently pay its liabilities represented by the reserves for injuries, damages, and losses for which it was liable, were deposited in plaintiff's treasury and were commingled together and with all other funds of the plaintiff. From time to time after July 1, 1918, and during 1919, 1920, and 1921, some moneys were withdrawn from the plaintiff's treasury and invested in income-producing securities. Moneys not so withdrawn were deposited in banks in the name of the plaintiff and subject to its sole order, interest being received with respect to such bank deposits, as hereinbefore mentioned.

The plaintiff accounted in its books for interest received in 1920 and 1921 according to the accounting system prescribed by the Interstate Commerce Commission, under two classifications, to wit, interest from unfunded obligations and interest from funded obligations. By the first was meant obligations with a maturity of less than one year from date of issue; by the second, obligations with a maturity of more than one year from date of issue.

The net charges for depreciation from 1918 to 1921, inclusive, totaled $8,577,394.43, which were set up in reserves. The said reserves were reflected in cash and other assets to the same extent and in the same way as other reserves, there being no segregation or allocation of any assets thereto.

All the interest received by plaintiff from all sources during the period July 1, 1918, to September 1, 1920, was included by plaintiff in its gross income when determining the amount of losses sustained from operations for the purpose of calculating the deficits which the Director General and the United States made good under the contract.

15. During the federal control period and during the guaranty period, plaintiff sold at a profit certain of its physical assets. Such profit likewise was included in income when computing the deficits chargeable to the United States.

16. Plaintiff credited to the Director General of Railroads for 1920 and 1921 interest computed as follows: The average rate of interest received on all its interest-bearing assets, including bonds, bank balances, mortgages and interest-bearing assets of every nature, was ascertained, and the Director General paid at the same average rate from time to time on the balances from time to time owing to the Director General after February 29, 1920. The amount of interest so credited for 1920 was $362,102.16. The debit of this amount was entered in the account, interest on unfunded debt, and said amount was charged as a deduction on the return for 1920 and allowed by the Commissioner of Internal Revenue.

17. There was no relation in the books between the credits resulting from interest received made to account No. 309, interest on unfunded securities and accounts, and debits resulting from interest paid on unfunded

debt made to account No. 324, interest on unfunded debt. These accounts were in no way tied together. The amount of interest so charged as a deduction and credited for 1921 was $238,276.84. This amount was charged as a deduction from income in the return for 1921 and was allowed by the Commissioner. All interest received or accrued during 1920 and 1921, including interest on government obligations, except that which was wholly exempt, was included as income in the returns for those years.

18. The securities in which the plaintiff invested were held by its treasurer in the city of New York. Neither the Director General nor the Treasury Department of the United States had any access to the securities or the coupons on them, and they exercised no control over and received no notice of the purchase or sale by plaintiff of the securities, or withdrawals from and deposits in the bank accounts. In December, 1924, a final settlement agreement was made between the plaintiff and the Director General, at which time plaintiff paid certain amounts to the Director General and obligated itself to pay further amounts. The Director General at that time left with the plaintiff a trust fund of $700,000, being the estimated amount necessary to liquidate the remaining obligations of the plaintiff incurred during the period of federal control from July 1, 1918, to February 29, 1920. This trust fund was deposited in the bank in plaintiff's name as trustee for the Director General. Part of the fund was immediately invested in Liberty loan bonds purchased by the Director General from plaintiff at the market price on the day of the purchase. At that time plaintiff owned more than $1,000,000 par amount of Liberty bonds which it had owned prior to March 1, 1920.

19. The Director General of Railroads in his report for 1924 set forth the following:

"During the period of this contract, July 1, 1918, to February 29, 1920, the 50.25 per cent. of the gross revenue which the express company was required to pay to the Railroad Administration amounted to $228,389,436.93. However, the express company was unable to meet its operating expenses and taxes from the 49.75 per cent. of the gross revenue remaining. A deficit resulted, amounting to $36,047,460.14, which was deducted from the $228,389,436.93 due the Railroad Administration, so that the Railroad Administration received in cash $190,041,976.79 and an obligation for $2,300,000 from the American Railway Express Co. for the period July 1, 1918, to February 29, 1920.

"At the end of Federal control arrangements were made with the express company by Director General Hines for it to liquidate all transactions arising out of the Federal-control period, and chargeable under the agreement with it to the operations of this period.

"The accounts as between the express company and the Railroad Administration have been carefully audited by the respective comptrollers of the two organizations, and, as a result, on December 11, 1924, an agreement of final settlement was entered into between the said parties, in which an indebtedness of a balance of $4,610,000 was admitted by the express company. Of this amount $1,610,000 was paid in cash; an obligation of the express company bearing 6 per cent. interest was given in the sum of $2,300,000, this obligation being secured by assignment of whatever sum may be finally found due the express company from the Government by the Interstate Commerce Commission, under section 209 of the transportation act; and a trustee account of $700,000 was set up to enable the liquidation of the affairs of the American Railway Express Co. to be completed, provision being made to collect through this account all outstanding assets and pay all outstanding liabilities.

"Practically all of the liabilities consist of pending litigation. On December 31, 1924, there were pending some 2,295 cases, in which there was claimed an aggregate of $1,036,369.04. The adjustment of this litigation and the collection of outstanding assets is being prosecuted as rapidly as possible."

20. In the return for 1921 plaintiff reported an invested capital of $35,069,512.40. The Commissioner of Internal Revenue in letters of May 15, 1926, and February 21, 1927, constituting his final decision in respect of plaintiff's tax liability for the taxable years in question, computed and determined an invested capital for 1921 of $33,055,343. In this determination the Commissioner excluded from invested capital $1,248,633.38 on account of the qualified common stock of $1,594,000 issued by plaintiff upon its organization to the Adams Express Company on the ground that nothing had been paid in to plaintiff for this stock. The Commissioner, however, permitted the amount of $345,366.62 to remain in invested capital for 1921 on account of this item, said amount being the total of the charges made by plaintiff during the federal control period and the guaranty period which the Director General and the Interstate Commerce Commission had allow-

ed to stand in arriving at the settlements with the Director General and the Treasury Department.

21. The Commissioner of Internal Revenue further reduced invested capital for 1921 in the amount of $1,199,720.12 on the ground, as stated in his letter to the plaintiff, that "the property with which the American Railway Express Company commenced operation was acquired from the old express companies on the basis of its depreciated book value as of November 30, 1917, and payment therefor was made in capital stock. Actual transfer of the property did not take place, however, until July 1, 1918, and depreciation accrued amounting to $1,199,720.12. Apparently this was not taken into consideration when the stock was issued, inasmuch as the amount was equal to the November 30, 1917, book value of the property with no adjustment for depreciation."

This adjustment by the Commissioner was made without investigation or examination of the property acquired by the plaintiff, or the value at the date of acquisition. (See Finding 7.)

Lyle T. Alverson, of New York City (Wayne Johnson, of New York City, on the brief), for plaintiff.

James A. Cosgrove, of Washington, D. C., and Charles B. Rugg, Asst. Atty. Gen. (Lionel A. Norman, of Washington, D. C., on the brief), for the United States.

Before BOOTH, Chief Justice, and LITTLETON, WILLIAMS, WHALEY, and GREEN, Judges.

LITTLETON, Judge.

█ The first question is whether the plaintiff is entitled under section 236 of the Revenue Acts of 1918 and 1921 (40 Stat. 1080, 42 Stat. 257) to a credit for 1920 and 1921 in computing the income subject to the normal income tax of 10 per cent. of the amount of interest received on obligations of the United States which interest was included in income for these years.

The Commissioner of Internal Revenue denied the plaintiff a credit in the amount of $802,906.40 for 1920 and $228,426.94 for 1921, and the defendant here contends that this action should be approved on the ground that the legal relationship between the plaintiff and the Director General of Railroads was that of fiduciary and beneficiary; that the funds which the plaintiff invested in the obligations of the United States producing this interest belonged to the United States.

The defendant now agrees that, if it should be held that the securities in question were purchased with funds belonging to the Director General or the United States, the income received thereon should not be included in gross income. It further agrees that, if the relationship of the Director General and plaintiff was that of creditor and debtor, the plaintiff is entitled to the credits claimed, and properly treated them on its returns. The history and purpose of plaintiff's organization are shown by the agreement of June 10 of the old express companies, the contract of June 21, 1918, between the Director General of Railroads and the old express companies, and the contract of June 26, 1918, between the Director General and the plaintiff. The legal relationship of the Director General and the plaintiff and the plaintiff's rights and responsibilities are to be determined from these agreements and the practical construction thereof by the parties concerned.

█ We are of the opinion that the obligations of the United States which produced the interest in question for 1920 and 1921 were not the property of the Director General of Railroads or of the Treasury Department, but were plaintiff's property and that the interest therefrom was properly treated by it on its returns. The relationship of the Director General of Railroads and the plaintiff was contractual and was that of debtor and creditor, and not fiduciary. A fiduciary relationship connotes a relation of trust as the basis of obligation of the one and of security for the protection of the right of the other, rather than a basis of contractual provisions. It requires an element of confidence reposed by one in another without that limitation upon authority or accountability that contract terms impose, or without those exact limitations that are applicable in determining the rights and responsibilities of a creditor and debtor. Fiduciary relationship cannot exist in those instances where the contract provisions are mandatory, because of the nature of the work, or where the contract is resorted to in order that the exact rights and responsibilities may be definitely defined.

There is no similarity between the operations of the plaintiff company and those of the railroads under federal control. Plaintiff took over the properties of all of the express companies and carried on the express business in its corporate capacity with its own properties subject to the terms of the contract with the Director General of Railroads. Although the President in November, 1918, issued a proclamation assuming control of the

system of transportation called the American Railway Express Company and directed that the possession, control, operation, and utilization of said express transportation system by him undertaken should be exercised by the Director General of Railroads, the Director General did not assume direction, control, and operation of the express transportation system, but by a further contract with the plaintiff of November 21, 1918, after the President's proclamation, adopted, ratified, and confirmed the contract with plaintiff of June 26, 1918, and agreed that the express transportation business was to be managed and conducted during the period of federal control, under the terms of said contract, by the board of directors, officers, and employees of the plaintiff company, and that the contract of June 26, 1918, should fix, according to law, the compensation to which the plaintiff should be entitled so long as the said agreement remained in force. The Director General had assumed direction, control, and operation of railroads, and the contract with plaintiff was for the purpose of centralizing the management and control of the express transportation business in one company and providing for certain payments by that company to the Director General in lieu of express-privilege payments formerly made to the railroads, prior to federal control, by the various express companies carrying on express business over their lines. The properties of the express companies and the express business carried on in the United States might have been taken over and directly managed and operated by the Director General, as was done in respect to the properties of the business of railroads. This however, was not done; the contractual arrangement being used instead. There was no supervision or control of the details of operations. Neither the Director General nor the Treasury Department evidenced any control over or interest in the investment affairs of the plaintiff. The government assumed no responsibility for the payment of current operating expenses or claims against the corporation. For all of these matters the plaintiff was liable in its corporate capacity, and, having executed the contract which left the management of the affairs of the express companies in the hands of the plaintiff subject to the provisions covering operations, payment of expenses, claims, taxes, and disposition of profits, etc., the respective rights and obligations with reference to the operation of the express business, as and when funds accumulated, of necessity became one of debtor and creditor.

The contract of June 26, 1918, was similar in many respects to contracts between express companies and railroads free of government control. The business was to be "conducted under such rates, charges, classifications, regulations, and practices as are now or may hereafter be lawfully established." The Director General was required, as had been the railroads, to "furnish adequate and suitable space in cars properly equipped, lighted, and lettered, 'American Railway Express Company,' of the kind customarily furnished by railroad companies for the use of express companies on such passenger, mail, and express trains as may be designated from time to time by the Director General" and to permit the use of "a portion of station buildings on the lines covered by this agreement without charge therefor." The plaintiff was required to "use its teams, property, offices, and other facilities, and its agents and employees in operating an express transportation business on all the lines of railroad under Federal control." It was liable for all loss or damage to the facilities furnished by the Director General and for "all claims on account of loss, damage, or delay." It was precluded from making a defense in any action at law or equity "that it is by virtue of this contract an instrumentality or agency of the Federal Government," except with the approval of the Director General.

Under the revenue provisions, article 8 of the contract, the Director General was to receive 50.25 per cent. of the gross receipts from the express business over the roads under federal control for express privileges, but article 27, under which the plaintiff was protected against operating losses in any year, authorized plaintiff, in the event of such losses, to reduce the amount of 50.25 per cent. of the gross income, otherwise payable to the Director General for express privileges in a subsequent year. The balance of 49.75 per cent. plus the revenues from the express business over other railroads, after payments of the amounts due under operating contracts, plus all other income, was to be paid into a "Gross contract income," and from the latter the operating expenses were to be paid by plaintiff. Provision was also made with reference to the use and manner of disposition of the remainder of the fund to be identified as the "Contract income for division," in connection with which it was provided in part that "it is the understanding and agreement of the parties that the 'contract income for division' is not the income or property of the express company but is a fund resulting from the terms of this agreement in which the Director General and the express company have

a mutual interest." The last-mentioned provision with reference to the "contract income for division" is immaterial to a consideration of this question, since there was no "contract income for division" and no portion of such a fund produced any interest for which plaintiff claims credit.

There were other provisions in the contract with reference to the keeping of accounts, the payment of salaries, pensions, etc., made subject in some minor instances to indirect control by the Director General, but they were clearly intended to protect the interests of the government in the premises.

In our opinion, the provisions in the contract of June 26, 1918, especially those of article 8, establish the relationship of debtor and creditor between the plaintiff and the Director General, and this we think was intended and consummated.

The plaintiff put its own capital of almost $35,000,000 into the enterprise. The Director General furnished the transportation and received approximately one-half of plaintiff's gross income, less the sum necessary to repair plaintiff's losses, if any. It was the employment of plaintiff's capital that produced the funds and interest thereon which is here in controversy. Notwithstanding the fact that operations were conducted at a loss, it had funds in hand, because liabilities for damages and injuries, for which plaintiff alone was liable, were not, and in the nature of things could not be, paid currently, but were deferred until the claims therefor should be determined and adjudicated. The only obligation of plaintiff to the Director General was for express privileges in an amount equal to 50.25 per cent. of the gross income, less the amount of operating losses. There was never any income for division since the plaintiff operated at a loss during that part of the federal control period from July 1, 1918, when it acquired the properties of the various express companies, to February 29, 1920, and during the guaranty period, March 1 to September 1, 1920.

The entire tenor of the contract between the plaintiff and the Director General connotes contractual obligation rather than fiducial relation, and the practical construction of the contract shows that the parties regarded their relation as debtor and creditor. In the arrangement made between the plaintiff and the Director General to liquidate all transactions arising during the period of Federal control of railroads, a trustee account of $700,000 was provided to enable the liquidation of the affairs of the plaintiff during the federal control period; i. e., collection of the outstanding assets and payment of liabilities. A part of this trust fund was immediately invested in Liberty bonds which the Director General purchased from plaintiff at the market price on the date of purchase. At that time plaintiff owned over $1,000,000, par amount of the Liberty bonds which it had owned prior to March 1, 1920.

The term "sole agent of the Government" appears to have been used in the contract of June 26, 1918, in the sense of independent contractor and to signify the agreement by the Director General that plaintiff should have a monopoly of the express business over the railroads under federal control. It appears that the parties to the contract of June 26, 1918, construed it, throughout the period of its existence, as creating the relation of creditor and debtor, and this is of great, if not controlling, influence. Baltimore v. Baltimore Railroad, 10 Wall. 543, 19 L. Ed. 1043; Old Colony Trust Co. v. City of Omaha, 230 U. S. 100, 33 S. Ct. 967, 57 L. Ed. 1410.

The next issue is whether plaintiff is entitled to include in invested capital for 1921 $2,448,353.59 on account of the value of property paid in on July 1, 1918, for stock. There was no excess-profits tax liability for 1920, and this issue does not arise as to that year. In its return for 1921 plaintiff computed its invested capital by using the value of the property as fixed by the Director General of Railroads in the amount of $31,642,109.64 on July 1, 1918, for which stock was issued, except as to $109.64. The Commissioner of Internal Revenue reduced the claimed invested capital in the amount of $2,448,353.50. This reduction was made up of two items—first, a reduction of $1,199,720.12 in the amount fixed by the Director General of Railroads and entered by plaintiff upon its books and used with proper adjustments for depreciation, etc., in computing invested capital in the return, as the value of property paid in; and, second, a reduction of $1,248,633.38 of the amount of $1,594,000 entered by the plaintiff on its books as the value of the property paid in for so-called qualified stock issued to the Adams Express Company.

The first item of $1,199,720.12 was excluded from invested capital by the Commissioner on the ground that the value of the property paid in to plaintiff on July 1, 1918, and for which it issued ordinary common stock, represented the depreciated cost or

depreciated book value of such property on November 30, 1917, in the hands of the predecessor companies rather than its actual value on July 1, 1918, and that depreciation in the amount of $1,199,720.12 had accrued during the seven months intervening which operated to reduce the value for invested capital purposes in that amount. The Commissioner also held that the restrictive provisions of section 331 of the Revenue Act of 1918 (40 Stat. 1095) were applicable in determining the amount which plaintiff might include in invested capital. Counsel for the defendant, however, correctly agrees that the provisions of this section are not applicable, since an interest or control of 50 per cent. or more did not remain in any one of the predecessor owners. We are of opinion that the action of the Commissioner was erroneous. Article second of the agreement between the Director General and the predecessor express companies with reference to the organization of plaintiff and the transfer of the properties of the various express companies to plaintiff provided that "the new corporation shall be furnished cash by the Express Companies in a sufficient amount to constitute reasonable working capital. No shares of capital stock shall be issued except on payment therefor at par in *cash, or its equivalent in property at the fair market value thereof.*" (Italics supplied.) And article third provided that: "The initial issue of stock of said new corporation shall not be made until such issue shall have been approved in writing by the Director General." Article 24 of the contract of June 26, 1918, between the Director General and the plaintiff provided that: "The stock issued by the express company shall be sufficient to pay at par for the property transferred to it and to provide the cash necessary for working capital," and this contract also provided that no stock might be issued without the approval in writing of the Director General. The provision that stock should be issued for property paid in "at the fair market value thereof" can only mean the actual market value at the time paid in, and the record clearly justifies the conclusion that the valuation of the property by the Director General was as of that date.

The plaintiff was organized to serve the convenience of the United States on account of the war, and to operate according to the contract with the United States by the Director General of Railroads. The essence of the contract of June 26, 1918, was that plaintiff, for conducting the express business, should have a limited return upon the par amount of its capital stock, that any excess of such return should be divided with the United States, and that the Railroad Administration should guarantee plaintiff against operating loss. The United States therefore had a direct and vital interest in the amount of the capital stock which plaintiff might issue. The above-quoted provisions of the contracts were strictly complied with. The property of the old express companies was paid in. The Director General designated a representative of his office, and especially directed him to make, and he did make, an investigation of the amount and value of the property paid in. This investigation was for the sole purpose of determining the actual value of the properties acquired by plaintiff upon the commencement by it of operations July 1, 1918. Although in the agreement of June 10, 1918, by the express companies with reference to the organization of plaintiff the value of the properties to be transferred to the plaintiff was "estimated" to be $28,407,000 and in the agreement of June 21, 1918, between the Director General and these express companies, in paragraph second, the value of the properties to be transferred to the plaintiff, including the supplies and materials on hand, was "estimated" to be $30,000,000, as of November 30, 1917, it is clear, we think, that these estimates were not intended to be the actual value at which the properties should be paid in to plaintiff or to fix November 30, 1917, as the date on which the value of the property to be paid in on July 1, 1918, for stock should be determined. Paragraph second of the agreement of June 10, 1918, provided that no stock of plaintiff should be issued except for cash or its equivalent in property at the fair market value thereof. The old express companies continued to carry on the express business of the country until July 1, 1918, and we think it clear that the Director General, in determining the amount of stock which plaintiff might issue for property acquired, valued such property on July 1, 1918. After the properties of the express companies had been paid in and upon completion of his investigation of the amount and the value thereof, the Director General, by written certificates, approved the issuance by plaintiff of $34,642,109.64 capital stock, and this amount was issued except $109.64, which was adjusted by payment of cash to the old companies. Cash in the amount of $3,000,000 was paid in. The question before the Director General and the plaintiff was not the book value of the properties on the books of the predecessor companies or whether de-

preciation prior to July 1, 1918, was properly computed on their books, but the question was the actual value of the properties at the time paid in on July 1, 1918. The Director General therefore valued the physical properties paid in at $31,642,000 on July 1, 1918; that determination was advisedly made in order to protect the financial interests of the United States and in furtherance of the deliberate terms of the contract. The Bureau of Internal Revenue made no investigation of the quantity, amount, or value of the properties paid in to plaintiff for stock. The valuation by the Director General is not questioned by the defendant beyond the claim that it represented the depreciated cost or depreciated book value as of November 30, 1917. In this we are of opinion the defendant is in error. Sumpter Valley Ry. Co. v. Commissioner of Internal Revenue, 10 B. T. A. 1325.

█ The evidence establishes, and we have found as a fact, that the so-called qualified common stock of $1,594,000 issued to the Adams Express Company was issued for actual value residing in miscellaneous equipment paid in by the Adams-Southern Express Company to plaintiff in excess of the amount for which ordinary common stock was issued. Plaintiff therefore correctly included this item in computing invested capital, and the defendant was in error in excluding the same.

█ The foregoing conclusion that the stock of $1,594,000 was issued to the Adams Company for value in miscellaneous equipment paid in disposes of the last issue with reference to the depreciation deductions for 1920 and 1921 at an annual rate of $159,399.96. Plaintiff charged the amount of $1,594,000 to miscellaneous equipment, the property received in exchange for the issuance of qualified stock in that amount, and undertook the depreciation thereof on the basis of a ten-year life for such property. It charged against gross income in each of the years 1920 and 1921 10 per cent. of the total amount. The Bureau of Internal Revenue disallowed those charges to the extent of $53,-133.38 in 1920 and in the full amount for 1921 on the ground that nothing was paid in for the stock. Similar charges against income were made by plaintiff during 1918 and 1919. As hereinafter stated, between July 1, 1918, and February 29, 1920, plaintiff operated under the contract with the Director General, and from March 1, 1920 to August 31, 1920, it operated under the contract as continued by the provisions of section 209 (i) of the Transportation Act of 1920 (41 Stat. 467). By reason of these provisions in the contract and the Transportation Act, the government was directly interested in the amount which should be charged against gross income in order to determine the net operating income or deficit. The accounts rendered to the Director General and to the Interstate Commerce Commission for the purpose of determining the operating deficits from July 1, 1918, to August 31, 1920, showed deductions from income on account of these charges for depreciation for exhaustion, wear, and tear of miscellaneous equipment. Both the Director General and the Interstate Commerce Commission first objected to such charges, claiming that they should not be reflected in the deficits charged to the Director General under the contract and the United States under section 209 of the Transportation Act (41 Stat. 464). After full investigation and consideration, the Director General and the Interstate Commerce Commission agreed that the charges were proper and they were allowed to stand. Under the accounting according to the contracts made by plaintiff with the class I railroads of the United States September 1, 1920, the committee representing all of the railroads made substantially the same objection in respect to the annual charge for depreciation in respect of the sum of $1,594,000. After a full investigation and consideration, however, the charge was permitted to stand as a deduction in favor of plaintiff and against the railroads under those contracts. No investigation of the amount of value of the equipment acquired by plaintiff was ever made by the Bureau of Internal Revenue. The evidence overcomes the determination of the Commissioner of Internal Revenue that nothing of value was acquired for this stock. The deductions claimed are therefore allowed.

Plaintiff is entitled to recover $183,235.45, with interest as provided by law, for which judgment will be entered. It is so ordered.