## GUARANTY TRUST CO. OF NEW YORK et al. v. SEABOARD AIR LINE RY. CO. et al.

### No. 214.

District Court, E. D. Virginia.
July 31, 1945.

See also 53 F.Supp. 672; 60 F.Supp. 607.

Leonard D. Adkins, of New York City, and A. O. B. Sparks, of Macon, Ga., for Reorganization Committee.

W. R. C. Cocke, of Norfolk, Va., and H. J. Gallagher, of New York City, for receivers.

James H. Price, of Greenville, S. C., for G. F. & A. R. Co.

Harry S. Strozier, of Macon, Ga., for Trustee in Bankruptcy for G. F. & A.

Vermont Hatch, of New York City, for Bankers Trust Co. and R. Gregory Page, as trustees of G. F. & A. First Mtge.

CHESNUT, District Judge.

In the course of reorganization of the Seaboard Air Line Railway Company, the Reorganization Managers or Committee, as authorized by an order of this court dated February 8, 1944, purchased $1,574,000 principal amount of Georgia, Florida & Alabama Railroad Company Bonds (hereinafter called the G. F. & A.) paying therefor $750 per $1,000 bond, with funds held by the Seaboard Receivers. The amount purchased represents about 90% of the outstanding first mortgage bonds of the Railroad Company, which, prior to the receivership of the Seaboard, had been a leased line and subsequently, after disaffirmance of the lease by the Receivers of the Seaboard, had been operated by them under court orders.

On July 12, 1944 the G. F. & A. filed its petition in the United States District Court for the Middle District of Georgia seeking

reorganization under the provisions of section 77 of the National Bankruptcy Act, 11 U.S.C.A. § 205. Shortly thereafter, on August 21, 1944, Leon S. Dure, who had been an equity court receiver in Georgia for the G. F. & A., and was subsequently appointed its trustee in the bankruptcy proceeding, filed a petition in the bankruptcy case seeking a judicial declaration that in the acquisition of the G. F. & A. Bonds the Reorganization Committee of the Seaboard and its Receivers "were acting as trustees of the debtor (G.F.& A.) and for and in its behalf, and acquired said bonds with funds belonging to the debtor, and now hold them for the account of the debtor as trustee for the debtor." Upon service of notice upon the Committee and the Receivers they respectively filed motions in the Georgia court to dismiss the petition against them on jurisdictional grounds. After hearing, these motions were granted by the court (Judge Lovett). However, in view of this attack upon their title to the bonds the Reorganization Committee have filed in this court a petition under and pursuant to section 57 of the Judicial Code, 28 U.S.C.A. § 118, to remove the cloud upon their title to the bonds, being personal property within the territorial jurisdiction of this court. After praying for process against all interested parties in accordance with the applicable procedure, the petition further prayed that this court after hearing re-affirm its prior orders for the purchase of the bonds and establish title of the Committee thereto free of any lien, charge, claim or trust in favor of the G.F.& A. or its trustee or other adverse claimants. Leon S. Dure, trustee of the G.F.& A., the corporation itself by its officers, and the Bankers Trust Company and R. Gregory Page, Trustees under the mortgage securing the bonds of the G.F.& A. have severally appeared and filed answers to the petition. A hearing in the case was held on June 18 and 19, 1945, at which extended evidence was given and the case submitted for determination upon oral arguments, and briefs subsequently filed.

The question now to be decided is whether the Reorganization Committee holds good title to the bonds for the benefit of the creditors of the Seaboard Air Line Railway, as a part of the plan for reorganization of the Seaboard, or whether the bonds are impressed with a trust in favor of the G.F. & A. or its Trustee subject to their order and demand, upon payment to the Reorganization Committee, or the Receivers of the Seaboard, of the cost of acquisition of said bonds together with interest thereon.

The contention of the G.F.& A. and its bankruptcy trustee, is that the trust arose because the bonds were purchased from funds due from the Seaboard Receivers to the G.F.& A. from operation of the G.F.& A. by the Receivers. This fact is denied by the Reorganization Committee and the Receivers who say that, as provided in the order of this court for the purchase of the bonds dated February 8, 1944, the purchase price for the bonds was paid from cash in the hands of the Receivers belonging to creditors of the Seaboard Air Line Railway, and that no funds of or belonging to the G.F.& A. were used or applied for that purpose, and furthermore that there never has been up to the present time, and is not now, any sum due and payable to the G.F. & A. under the operating arrangement. The Bankers Trust Company and Mr. Page as mortgage trustees for the G.F.& A bonds, have also filed a limited appearance and answer to the affirmative allegations contained in the answer of the G.F.& A to the petition of the Reorganization Committee. In this answer these trustees contend that if now or hereafter any sum becomes payable by the Seaboard Receivers to the G.F. & A. or its bankruptcy trustee, under the operating arrangement, such sums (less proper court expenses) must be paid to the bankruptcy trustee for the benefit equally and ratably of all the outstanding bonds, in accordance with the provisions of the mortgage and the impounding orders heretofore entered by the Georgia Court in favor of the mortgage trustee affecting income from the operation of the Railroad. They expressly deny that this court has jurisdiction and authority to charge the cost of acquisition of the bonds by the Reorganization Committee against the sum, if any, now or hereafter due and payable by the Seaboard Receivers to the G.F.& A.

It is apparent that the underlying question in the controversy is to whom did the funds used for the purchase of the bonds belong—to the Seaboard creditors or to the G.F.& A.? Incidental to this question is the further one—whether there was on February 8, 1944 when the purchase was made, any sum payable by the Receivers to the G.F.& A. And another question presented is whether the relations of the Seaboard Receivers to the G.F.& A. in any way constitute a trust or fiduciary relationship

from which it could be said that in the purchase of the bonds the Seaboard Receivers or the Reorganization Committee is making a profit out of the alleged trust property in its favor and adverse to the G.F.& A. as an alleged beneficiary of the trust.

To resolve these questions it is necessary to give an historical outline of the whole relationship of the Seaboard Air Line Railway and its Receivers, to the G.F.& A. The story is a rather long one but the facts are not really in dispute. So far as possible the history will be related chronologically.

The present Georgia, Florida & Alabama Railroad Company was organized or recapitalized in 1927 as the successor to a railroad company of the same name. The railroad line consisting now of about 132 miles, extends generally from Richland, Georgia, to Tallahassee, Florida. Its capitalization consists of $1,750,000 par value of first mortgage 6% bonds outstanding and in the hands of the public on February 8, 1944. The principal and interest accumulated and unpaid to January 1, 1944, amounted to $3,-611,562.50. Its capital stock consists of—1st. pfd. 5%, 10,000 shares, par value of $100 each, all outstanding; 2d pfd. 4% to 5%, 5,000 shares, par value $100 each, all outstanding, and common stock without par value, 10,000 shares. Upon its recapitalization the bonds of the new railroad were sold to the public, its common stock was issued to the Seaboard Air Line Railway, and its preferred stocks were also issued to former interests or to the public. The Company leased all of its property from Tallahassee, Florida, to Richland, Georgia, together with its rolling stock and other property, to the Seaboard, which agreed to pay net rentals sufficient to pay the interest and dividends on the bonds and preferred stocks; and also taxes and operating expenses. These payments were made by the Seaboard until it went into general receivership in the Eastern District of Virginia on December 23, 1930, with ancillary receivership in the Southern District of Florida.

After the Seaboard receivership the Receivers disaffirmed the lease and endeavored to surrender the property to the G.F. & A. Corporation; but the latter refused to take it back and operate it, and successfully opposed the petition of the Seaboard Receivers to the Interstate Commerce Commission to abandon the operation of the property. The Receivers were, therefore, by virtue of this exercise of public authority, forced to continue the operation of the G.F.& A. In consequence various questions and controversies arose growing out of the operation. In that situation on March 17, 1936, a written proposal for the continued operation of the G.F.& A. by the Seaboard Receivers was made to them by the G.F.& A. Bondholders Protective Committee and its mortgage trustees, and by the G.F.& A. Corporation and its Georgia Receivers. This proposal is printed in full in Vol. XII of the record of the Seaboard receivership, pp. 10295 to 10304, and is an exhibit in the case. The proposal, after dealing with various matters in controversy and not now material, included the following provisions: (1) The accounting between the G.F.& A. and the Seaboard Receivers was settled and determined without claim of either against the other up to and including December 31, 1934; (2) the operation of the G.F.& A. subsequent to December 31, 1934, to be for the account of the G.F.& A. and its Receivers and the accounting "shall be determined upon the basis of the general formula subject to any changes therein which may be urged by any party to the Seaboard receivership proceedings, or by any of the G.F.& A. interests there against and which may be approved by the Seaboard receivership courts or either of them (with certain exceptions not here material)"; (3) the Seaboard Receivers to have a lien and charge against the G.F.& A. property in their possession prior to the G.F.& A. mortgage and have other liens thereon other than tax liens to the amount of any deficit resulting after December 31, 1934 from the operation, and also for all amounts expended by them after December 31, 1934 and chargeable to capital account for additions, betterments and construction work as authorized and approved by the Seaboard Receivership courts or either thereof after notice to the G.F.& A. and its Receivers and its mortgage trustees; (4) operation of the G.F. & A. properties by the Seaboard Receivers to be subject to termination and return by the Seaboard Receivers of the properties to the G.F.& A. Receivers or their successors to the right of possession, on six months written notice from the Seaboard Receivers to the G.F.& A. interests who are parties to this agreement, or on similar notice to the Seaboard Receivers from any one directed by the G.F.& A. receivership court, or otherwise, properly authorized to give such notice; (5) upon such

notice being given the Seaboard Receivers were entitled to be paid the amount of any deficits or other charges decreed by the Seaboard receivership court to exist against the G.F.& A. properties in favor of the Seaboard Receivers, or security to be furnished before surrender of the property; (6) upon termination pursuant to notice, "all accounts between the parties hereto shall be forthwith adjusted, and the net amount of such accounts shall thereupon, in the absence of other agreements to the contrary, immediately become payable to the party having a net credit in its favor"; (7) the Seaboard Receivers were to make reports semi-annually showing the results of operations.

The proposal was conditioned upon the approval of the Seaboard and G.F.& A. receivership courts and the entry of appropriate orders and decrees, with the consent or acquiescence of all parties to the respective receivership proceedings. This proposal was formally reported to the respective courts and approved by orders entered by the Virginia Court on April 10, 1936; by the Florida Court on April 29, 1936, and by the Georgia Court on April 27, 1936. (See printed Receivership Record Vol. XII, pp. 10315, et seq.; Vol. XIII, pp. 10458, et seq. and 10477, et seq., also filed as exhibits in this case.)

The G.F.& A. has been operated in accordance with these court orders up to the present time. After the institution of the section 77 reorganization proceeding, the Georgia Court specifically ordered that the operating agreement should continue in effect as therein provided. No notice of discontinuance has been given by either party to the other.

The semi-annual statements of the operating accounts from January 1, 1935 were regularly and continuously submitted by the Seaboard Receivers to the G.F.& A. Receivers until 1941. During 1941 and to June 20, 1943, the special master had under consideration proposed plans for the reorganization of the Seaboard Air Line Railway. Several elaborate and detailed plans were submitted and studied. The problem was largely affected by the respective earning capacities of the numerous separate Divisions of the Railway, the earnings dependent importantly upon the formula to be applied for the segregation of earnings of the System and the allocation thereof to the several Divisions. Four separate formulae were under consideration. The prep-

aration of statements necessary for the master's consideration imposed a very great burden upon the Receivers' clerical and bookkeeping department. To obtain some temporary relief the Receivers' auditor, Mr. Jones, proposed to the special master that preparation of statements under the general formula should be temporarily suspended. This was approved by the master with the acquiescence of all interests appearing before him. The Georgia Receiver of the G.F.& A. was so notified and interposed no objection.

A Mr. W. H. Simpson, a substantial merchant or manufacturer of South Carolina, had become interested in some of the Seaboard securities, and actively participated in many of the hearings before the special master. In March 1943 he, in association with Mr. W. G. Borer, a Philadelphia stock broker and dealer in securities, bought the whole issue of the first preferred stock of the G.F.& A. ($1,000,000) for about $5,000, Mr. Simpson taking 8,000 shares. By reason of the default of payment of dividends on this stock the voting power shifted to it and Mr. Simpson was elected president and Mr. Borer, vice president of the G.F.& A. Mr. Simpson filed a proposed plan of reorganization for the Seaboard with the special master (see master's report, printed pages 227, 228) which made no provision for beneficial treatment of the preferred or common stocks of the G.F.& A., but did suggest a reorganization of the G.F.& A. under section 77.

On July 20, 1943 the master filed his elaborate report and plan for the reorganization of the Seaboard. All parties in interest were notified by court order by Judge Way that exceptions, if any, would be heard on October 18, 1943. Owing to the regrettable illness of Judge Way and his subsequent death, this hearing occurred beginning October 25, 1943, before Judge Akerman of the Southern District of Florida, and the writer of this opinion, sitting jointly. Messrs. Simpson and Borer personally participated in this hearing and Mr. Borer has attended most, if not all, of the various subsequent hearings affecting the Seaboard, and has given the court the benefit of his views from time to time on matters in which he was particularly interested. In general he has been favorable to the reorganization plan with the exception of a few particular matters including those affecting the G.F.& A.

In the special master's report as to the proposed distribution of new securities, no provision was made for any distribution to the G.F.& A. securities other than the first mortgage bonds. As to them, the report provided that each $1,000 bond should receive $50 in cash, $217.36 in new first mortgage bonds; $424.53 in income mortgage bonds; $135.01 preferred stock and $764.98 in common stock. The G.F.& A. Bondholders Committee of which Mr. Nye was Chairman (being the same Committee which had proposed the terms of the operating agreement above referred to) filed exceptions to the master's report on the ground that the proposed allocation of new securities for the G.F.& A. bonds was insufficient and unsatisfactory to the Committee. Mr. Simpson filed exceptions adopting in substance the exceptions filed by the Nye Committee but not objecting to nonrecognition of the preferred stocks of the G.F.& A. Mr. Nye was present and participated in the court hearing. After much testimony and argument on the whole Seaboard reorganization problem the court appointed a Conference Committee with representatives of various interests. This Committee conferred with the Nye Committee and agreed with them that in lieu of the proposed distribution of new securities for the G.F.& A. bonds, there should be paid in cash for each bond the sum of $750. This amendment of the plan was accepted by the court in the ratification of the plan with modifications. However, it appeared that the acceptance of the modifications as to the G.F.& A. interests by the Nye Committee was conditioned upon the prompt payment of $750 per $1,000 bond; and that Committee was unwilling to assent to the modified plan unless payment were very promptly made as the Committee was not willing to await the final consummation of the plan which would necessarily be delayed for some months at the least. To meet this situation the Reorganization Committee which had been appointed to carry out the plan as modified, filed a petition with the court asking authority to immediately consummate the arrangement with the Nye Committee, by at once purchasing the bonds. This petition came on for hearing in court on February 8, 1944. Messrs. Simpson and Borer were notified of the hearing and personally attended and objected to the purchase of the G.F.& A. bonds by the Committee on the ground that they should be purchased by the Receivers

for the account and benefit of the G.F.& A. from funds which, as they contended, were then or should be found to be due from the Seaboard Receivers to the G.F.& A. under the operating orders. Notice of the hearing had also been sent to the Georgia Receiver of the G.F.& A. but he did not appear or participate in the hearing. As a result of the hearing the court by order authorized the Committee to purchase all the G.F.& A. bonds offered through the G.F. & A. Bondholders Committee at $750 per bond, payment to be made from cash funds then in the hands of the Receivers which belonged to the creditors of the Seaboard generally, and were applicable for reorganization purposes, and in which the G.F.& A. had no interest. It was a further provision of the order that any sum thereafter found to be due and payable by the Seaboard Receivers to the G. F.& A. under the operating agreement should be paid from a special reserve fund of $6,000,000 in the hands of the Receivers which had theretofore been established. No appeal was taken from this order, and thereafter the Reorganization Committee purchased from the Nye Committee $1,-574,000 par amount of G.F.& A. bonds, being 90% of the entire outstanding amount, at $750 per bond.

The opinion of this court was filed on December 15, 1943 stating the principles applied by the court in ratifying the plan with modifications. Guaranty Trust Co. et al. v. Seaboard Air Line R., D.C., 53 F. Supp. 672. The situation with respect to the G.F.& A. will be found outlined on page 695 of the opinion in 53 F.Supp. It was there said:

"The average net earnings of the Line (G.F.& A.) for the five-year period are only $3,623. The Line had deficits in 1937 to 1939 inclusive, and earnings of only $1,606 in 1940. The principal and interest to January 1, 1944, of bonds publicly held aggregated $3,611,565.50. * * * As the available proportion of the new capitalization for this Division was not sufficient even at par values to equal the claim, principal and interest, on the bonds, it is obvious that there was no value in the preferred stock. Consequently there is no basis on which it can equitably participate in the reorganization."

An appeal was taken from the decree of the Virginia Court by certain bondholders of the Georgia & Alabama Division and

by Mr. Simpson as a bondholder of the South Bound Division. The decree of the Virginia court was affirmed by the Circuit Court of Appeals of the Fourth Circuit on August 2, 1944, 145 F.2d 40, and certiorari was denied by the Supreme Court, Badenhausen v. Guaranty Trust Co., 323 U.S. 797, 65 S.Ct. 440. An appeal was also taken by the Badenhausen Committee representing the Georgia & Alabama bonds, from the decree of the Florida court affirming the plan with modifications, which was affirmed in the Fifth Circuit, Badenhausen v. Glazebrook, 148 F.2d 450. No appeal by Mr. Simpson or other G.F.& A. interests was taken from the decree ratifying the plan as modified.

After the purchase of the G.F.& A. preferred stock by Mr. Simpson in March 1943, he requested the Seaboard Receivers to furnish him with operating statements of the G.F.& A. Under the operating orders these statements were to be prepared in accordance with the general formula of 1932. On September 30, 1943 the Receivers furnished the statements for the years 1941 and 1942, and on December 10, 1943, they furnished statements (partially estimated) for the ten-year period of January 1, 1935 to December 31, 1944, which showed deficits for the years 1935 to 1939, with final credit for the ten-year period of $211,000. The master's report and plan for reorganization had treated earnings of the several Divisions largely on the so-called Kennedy formula. The application of this formula to some of the Divisions resulted in better earnings statements. Mr. Simpson requested the Receivers to give him figures for the G.F. & A. using the Kennedy formula. On February 23, 1944 such a statement was given to Mr. Simpson by the Receivers which showed under the Kennedy formula an apparent credit for the G.F.& A. for the ten-year period, 1935 to 1943, of $1,117,000. Some of the G.F.& A. interests informally indicated to the Receivers that they would prefer to have the operating orders modified or clarified by the court by the substitution of the Kennedy formula for the general formula; but as no one made any application to the court for this purpose, the Receivers took the initiative by asking the Florida Court for instructions and in May 1944 the Florida Court, after notice to and acquiescence of all parties in interest, including the Georgia Receiver of the G.F.& A., adopted the Kennedy formula for the G.F.& A. operating account. And subsequently with the concurrence of all the G.F.& A. interests the Virginia Court likewise approved the Kennedy formula for the G.F.& A.

At the recent hearing in this court the G.F.& A. Exhibit No. 9, shows a "tentative" credit to the G.F.& A. for the ten-year period ending December 31, 1944, in the amount of $1,461,044, computed subject to the explanatory notes. But, of course, under the operating orders no part of this sum is now due and payable by the Seaboard Receivers to the G.F.& A. because there has been no termination of the operating arrangement and the final sum, if any, will not be ascertained until after the expiration of six months' notice for termination when given. It is also important to note that under the operating agreement the "tentative" balance is subject to deductions for subsequent deficits, if any, and maintenance and betterments to the physical property of the Railway; and there is uncontradicted evidence in the record that there has been, owing to war conditions, a very considerable amount of deferred maintenance and substantial betterments, especially with respect to the renewal of rails, that must be made as soon as materials therefor are available. Mr. Powell, one of the Seaboard Receivers, testified that the probable cost of this deferred maintenance and badly needed betterments at current prices would probably amount to about $1,300,000, and that for the physical safety of the Road, these improvements ought to be made as soon as possible and should have been made before this had it been possible to do so under existing war conditions.

The operating account for the ten-year period has not yet been accepted and approved by the bankruptcy trustee of the G.F.& A.; and in the section 77 case now pending in Georgia, the G.F.& A. filed a petition to obtain an order of court that the accounting be under the jurisdiction of the Georgia Court. On a hearing on that petition it appears that Judge Lovett suggested or authorized Mr. Dure as Trustee, to intervene and become a party in this court for purposes of the accounting, and possibly other relief. This has been done, and recently, after hearing, an order of this court was passed providing that any objections to the accounting statement to be made by the G.F.& A. Trustee should be filed on or before August 20, 1945, after which a hearing would be had if any exceptions are filed. Mr. Dure as Trustee

214

also filed a petition in this court to the effect that as the Trustee he is without funds available to obtain expert advice with regard to the correctness of the accounting and also desires expert advice to enable him to make a report and recommendations to the Georgia court with respect to the continued operation of the Railroad. Another petition has been filed in the Georgia court by the G.F.& A. Corporation asking that the court authorize its Trustee to give notice of the termination of the present operating agreement, but no action has been taken on that petition by the Georgia court. To enable the G.F.& A. Trustee to obtain the expert assistance and advice that he desires, this court has authorized, without objection from the Seaboard Receivers or the Reorganization Committee, that $100,000 be advanced and paid to the Georgia Trustee for the purposes stated; and the Receivers have made this advance, to be charged in the final accounting.

Heretofore from time to time during the pendency of the Seaboard receivership, each of the Trustees holding underlying or general mortgages of the Seaboard, have respectively filed mortgage foreclosure proceedings and obtained impounding orders with respect to earnings applicable to their several mortgages. The mortgage trustees of the G.F.& A. filed such a mortgage foreclosure case in the Middle District of Georgia on April 12, 1935, and subsequently obtained an impounding order in their favor with respect specifically to any earnings that might be subsequently payable to the G.F.& A. from the Seaboard Receivers under the operating orders. After the section 77 proceeding in the Georgia court these mortgage trustees on August 5, 1944, obtained an additional order extending and making effective the prior impounding order for the section 77 proceeding.

The only question now presented to the court is—where is the legal or equitable title to the G.F.& A. bonds now held by the Reorganization Committee of the Seaboard. They contend that both the legal and equitable title is in them. On the other hand the G.F.& A. interests contend that while the legal title is in the Reorganization Committee, they hold the bonds impressed with a trust subject to an option in favor of the G.F.& A. to obtain legal title to the bonds upon payment of $750 per $1,000 bond, plus interest on the sum advanced by the Reorganization Committee for that purpose.

■ The first contention of the G.F.& A. is that the bonds were paid for by moneys held by the Receivers for the account of the G.F.& A. and then payable to it; or at least that it should be held that the cost of the bonds should be charged against the G.F.& A. in the operating account. This contention is clearly untenable. Under the operating orders there is not now and never has been in the past any sum of money due from the Seaboard Receivers to the G.F.& A.; and whether on final accounting there will be any sum due and payable is still a matter of uncertainty. It is also presently uncertain when the operating agreement will be terminated. Evidently the Georgia Trustee is not now prepared to make a recommendation to the Georgia Court that it should be terminated. Even if the Georgia Court promptly decides to authorize its Trustee to give the six months notice for termination, I understand the approval of the Interstate Commerce Commission would have to be obtained before independent operation of the Road by the G.F.& A. or satisfactory arrangement made for its continuation in the public interest. Likewise I assume that if this court should now authorize the Seaboard Receivers to give notice of termination, approval of the Interstate Commerce Commission would also be necessary. It is well known that at the present time railroad operations are largely under the control of the Interstate Commerce Commission in the public interest. And if the operation must be continued by the Receivers for a considerable time in the future, the cost of much needed deferred maintenance and betterments will probably greatly reduce or exhaust the present "tentative" credit. It is, of course, not proposed by the Seaboard Receivers to incur extensive costs of betterments in the immediate future while the Georgia Court has under consideration the petition for giving notice of termination. And I understand that authority to make such betterments should first be obtained from the Florida Court, after notice to the G. F. & A. Trustee.

■ Apart from this consideration, there is clearly no authority under the present operating orders to charge the purchase price of the bonds to the operating account. And this court clearly would have no authority to make such a charge because if there were now presently due and payable a credit balance to the G. F. & A., it would as a matter of law have to be

paid to the Georgia Trustee for proper disposition under section 77, and apparently any net sum remaining after other proper disposition of the fund, would be claimed by the Bankers Trust Company as Trustee under the G. F. & A. mortgage, in consequence of prior impounding orders obtained by it from the Georgia court. It also appears from the evidence in this case that any net earnings to which the G. F. & A. might now be entitled would be possibly subject to the payment of income taxes, which is a matter, of course, with which this court is not concerned but would necessarily be involved in the Georgia Trustee's accounting in the Georgia Court. Under no aspect of the case would it have been permissible for this court when the original order for the purchase was made on February 8, 1944, or at this time, to direct that the cost of the bonds be charged against the operating accounts.

■ The G. F. & A. interests now make a broader claim. The contention is that the relations between the Seaboard Receivership and the G. F. & A. are such that in equity and good conscience this court should require the Reorganization Committee to hold the bonds subject to an option in favor of the G. F. & A. to purchase them at the price paid for them by the Reorganization Committee, plus interest. I am unable to find adequate basis for this contention in the undisputed history of the matter; but I will comment on the various considerations which have been urged by counsel for the G. F. & A. Receiver.

They say that the Seaboard Receivers were Trustees for the G. F. & A. and are seeking to make a profit out of their dealing with the trust res. It is not contended that there was any express written trust but that the circumstances give rise to what is referred to as a constructive or resulting trust.

The relevant facts are these. Before the Seaboard receivership in 1930 the G. F. & A. was the lessor and the Seaboard the lessee. After appointment, the Seaboard Receivers disaffirmed the lease and tried to surrender the property to the G. F. & A. It refused to resume the operation and successfully opposed the Receivers' petition to the Interstate Commerce Commission for abandonment of the property. Subsequently the operating arrangement was proposed by all the G. F. & A. interests and, with the assent of the Receivers, was approved by the several courts. I do not think the

resulting relationship constitutes a trust of any character. Certainly the relationship of lessor and lessee was not one of trust; that is conceded. It is contended, however, that the continuation of the operation which had originally been under a lease, on different terms of accounting, changed the relationship from that of debtor and creditor to that of a trusteeship. No authority is cited for the proposition, and I know of none. The nearest analogy would seem to be that furnished by the cases of Philadelphia Co. v. Dipple, 312 U.S. 168, 176, 61 S.Ct. 538, 85 L.Ed. 651, and Palmer v. Webster & Atlas Bank, 312 U.S. 156, 61 S.Ct. 542, 85 L.Ed. 642. In the former case the trustee under section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, continued, pending decision as to disaffirmance, the operation of subsidiary leased street railway lines. It was held that the original relation of debtor and creditor under the leases continued. In the latter case the trustees under section 77 of the Bankruptcy Act disaffirmed but were obliged by a provision in that Act to continue operation of a former leased line. It was held that they were not agents conducting the business of the lessors and were not liable for taxes on the lessors' property under the federal statute. 28 U.S.C.A. § 124(a). See also Railway & Express Co. v. United States, 56 F.2d 687, 703, 74 Ct.Cl. 191.

It seems rather extreme to spell out a trust relationship in this situation where the enforced continuance of operation of the leased line was imposed upon the Seaboard Receivers by public authority against their wish and to the possible detriment of the Seaboard secured creditors. At the most the duties of the Seaboard Receivers under the operating orders were no greater than those of agents of the G. F. & A. for the operation of the Road. As such agents it may be assumed that they were fiduciaries with respect to the particular subject matter of the agency in the sense that they were under the duty to operate the G. F. & A. Railroad with reasonable care and fidelity and to render true and accurate accounts of their operations. But the scope of the agency did not give them any rights, powers, duties or responsibilities with respect to the financing or general affairs of the G. F. & A. Clearly the matter of the purchase of the G. F. & A. bonds under order of this court from money belonging to creditors of the Seaboard

was not a matter within the scope of the agency for operating the G. F. & A. Railroad. The case would, of course, be quite different if moneys belonging to and payable to the G. F. & A. had been used for the purchase of the bonds. But as we have seen, the funds used did not belong to the G. F. & A. but belonged to the mortgage creditors of the Seaboard, a vast railroad system operating more than 4,000 miles of road, in many separate divisions and subject to many different mortgages. The trustees of these various mortgages had during the Seaboard receivership filed mortgage foreclosure suits and obtained impounding orders for their benefit as to the net operating earnings. Furthermore the bonds were not purchased by the Receivers for their own account, but by the Reorganization Managers for the account of the Seaboard mortgage creditors. There was clearly no fiduciary relation between the latter and the G. F. & A. There is no general principle of equity that disentitled them to buy bonds of the G. F. & A., and succeed to all the rights of the vendors. In re Lorraine Castle Apartments Bldg. Corp., 7 Cir., 149 F.2d 55, 58; Mokava Corporation v. Dolan, 2 Cir., 147 F.2d 340, 344; Security-First Nat. Bank v. Rindge Land Co., 9 Cir., 85 F.2d 557, 561, 107 A. L.R. 1240.

Another argument made for the G. F. & A. is that the Seaboard Receivers stand only in the shoes of the Seaboard Air Line Railway; that about $1,000,000 is due and payable from the Seaboard Air Line Railway Company for unpaid rentals due at the time of the receivership of the Seaboard under the lease of the G. F. & A. But this contention is not here applicable. There is no question now arising between the Seaboard Company and the G. F. & A. The latter with respect to unpaid rentals is merely a common and unsecured creditor against an insolvent corporation. It has been perfectly evident for a long time that the Seaboard System has been operated by the courts for the benefit of its secured creditors only.

It is also argued for the G. F. & A. that the Seaboard Receivers exercised bad faith toward the G. F. & A. in the purchase of the bonds. In support of this contention it is said that the Receivers, knowing that there was a large credit balance in favor of the G. F. & A. under the operating accounts, concealed that fact from the G. F. & A. and nevertheless recommended to this court that the G. F. & A. bonds should be purchased with moneys known to be available to the G. F. & A. and which, if they had been paid to it, would have enabled it to buy the bonds at a discount. This contention is contrary to the evidence in the case. There was no concealment regarding the accounts by the Receivers, nor did they initiate the purchase of the G. F. & A. Bonds. The purchase was made under an order of court on the petition of the Reorganization Committee as an initial step to carry out the plan of reorganization which had been approved by the court. As stated by Col. Anderson, one of the Receivers, at the hearing on February 8, 1944, the Receivers merely advised the court that they had cash funds available for the purpose of carrying out the plan and that in their opinion the investment of the funds for the Seaboard secured creditors would be a reasonable one as they saw the situation. Nor can it be said that the Receivers knew that there was a tentative large balance due to the G. F. & A. under the accounting. Up to that time the only authorized formula for the accounting was the general formula of 1932. It was not until May 15, 1944 that the Florida Court authorized the substitution of the Kennedy formula for the general formula. While the former produces tentatively much better earnings for the G. F. & A. the Receivers had no right to assume in advance of the court order that the change would be made. Certainly they were under no duty to the G. F. & A. to prepare and submit an accounting statement prepared under a formula which had not been authorized or even requested by the Georgia Receiver of the G. F. & A. No doubt all the parties were aware as a result of the hearings before the special master with respect to the results of different formulae, that many of the railroad divisions, including the G. F. & A. would be better off in their earning statements under the Kennedy formula. But this fact seems quite immaterial in view of the history of the whole matter. Furthermore, as has been related, Messrs. Simpson and Borer, officers of the G. F. & A. Corporation, were equally aware of the probable much better results respectively under the Kennedy formula, and indeed Mr. Simpson urged this upon the court at the hearing on February 8, 1944, asserting that the credit balance would exceed $3,-000,000, although the precise figures were not then available. Mr. Nye for the G. F.

& A. Bondholders Committee, had made a somewhat similar but more modest contention at the hearing on the plan of reorganization in October 1943.

█ Finally, it is contended that the prior order of this court for the purchase of the bonds should be modified in favor of the G. F. & A. by reason of what is called the "broad equities" of the case. In this connection it is said that the security holders of the G. F. & A. have received no interest or dividends since 1931; that their railroad property has been operated during the intervening years "under a hard bargain" as a part of the Seaboard System and has produced a substantial amount of gross revenues for it, but no net revenue for the G. F. & A.; that there now is a prospective balance of earnings shortly to be available for the G. F. & A. in the amount of more than $1,000,000; but that it is now proposed by the Seaboard to foreclose the G. F. & A. mortgage under which it holds 90% of the bonds and sell at an upset price at which there can be only one bidder, the Reorganized Seaboard Corporation, and thereby destroy valuable equities of preferred stockholders of the G. F. & A. It is contended that this will be an inequitable and harsh result and that on general principles of equity this court should *now* in the first instance restrain the Reorganization Committee from such use of the bonds.

The argument would be an appealing one if the assumptions of fact on which it is based were not contradicted by the evidence in the case. The word picture presented by the argument depicts the Seaboard creditors as a powerful and greedy mortgage creditor proposing by oppressive action to destroy valuable subordinate equities in the G. F. & A. But this picture distorts the true features of the case. Let us examine briefly the evidence as to the several assumptions made in this argument.

On this aspect of the case it is quite immaterial to make any distinction between the Seaboard Receivers and the Reorganization Committee; nor is it important in this respect to inquire with nicety just what is the relationship of the Seaboard Receivers to the G. F. & A. The point of the argument is that harsh and oppressive action is contemplated by the Seaboard creditors, as bondholders of the G. F. & A., against the preferred stockholders of the latter. The real parties in interest, therefore, are the Seaboard creditors and the G. F. & A. first preferred stockholders (Simpson and Borer). The question, therefore, becomes whether there is such a relationship between these two parties growing out of the history of the case, that requires or justifies this court in now declaring that the Seaboard creditors, as holders of the G. F. & A. bonds, have only a qualified ownership in the bonds limited to the cost of their purchase, with interest.

The assumptions of fact in the contention are (1) that there is some equity in favor of the G. F. & A. stockholders as against the Seaboard creditors by reason of the default of dividends on the G. F. & A. stock; (2) that a hard bargain was driven against the G. F. & A. in the operating agreements; (3) that the Seaboard creditors are now seeking an unfair profit on the purchase of their bonds, and (4) that there is presently value in the first preferred stock of the G. F. & A.

There is clearly no equity between the Seaboard creditors and the G. F. & A. stockholders by reason of the defaults in dividends to the latter. The default there was attributable to the insolvency of the Seaboard Railway Company and not to its mortgage creditors. The insolvency of the Seaboard Company also caused defaults in payment of interest to its mortgage creditors, which, in the cases of nearly all its mortgages have been continuous since 1930 to this time; and with minor exceptions in the case of a few of the underlying divisional mortgages there will be even under the reorganization plan a substantial loss of principal to many of the Seaboard mortgage creditors. The loss to the G. F. & A. security holders is not proportionately greatly different from that of the Seaboard creditors. Both have been the victims of general economic conditions affecting railroad securities.

The assumption that Seaboard creditors through their representatives, the Receivers, drove a hard bargain with the G. F. & A. after 1934 is seemingly based on the view that at the present time there is a credit balance in the operating accounts in favor of the G. F. & A. but which cannot now be used by it. But as we have seen, this balance is at best only a prospective and not now a certain one. More importantly the test as to whether the bargain was a hard one for the G. F. & A. must be judged by the situation when the bargain was made rather than by the pres-

ent even tentative end result. The undisputed history shows very clearly, I think, that it was not a hard bargain against the G. F. & A. It was certainly not one sought by the Seaboard creditors. They actively resisted the application to continue the operation, regarding it as a burden and not an asset. They were obliged by the exercise of public authority to continue the operation. The operations continued to show deficits until 1940 and these deficits had to be temporarily at least absorbed out of the revenues otherwise belonging to the Seaboard creditors. It is pointed out that under the operating orders the Seaboard could ultimately charge deficits against the G. F. & A. property even ahead of its bonds; but even this security was not unimpeachable because the fundamental test of value of a railroad is its earning capacity, and long continued mounting deficits might not be adequately secured by the pledge of a railroad property which has no earning capacity but only deficits in operation. The present tentative credit to the G. F. & A. is purely the result of the abnormally large traffic due to war conditions which, it is commonly recognized, forms no safe basis for an estimate of future earnings.

The evidence in the case does not justify the conclusion that the Seaboard creditors bought the G. F. & A. bonds at less than their market value and are now seeking a large and unearned increment in value on the purchase. The sale was freely made after open and fair negotiations between the competent and experienced Bondholders Committee of the G. F. & A. and the Seaboard Committee. The purchase price of $750 per bond was exactly the sum provided for in the modified reorganization plan which was acceptable to the Bondholders Committee if it could be promptly carried out with respect to their holdings. Ninety per cent. of the bondholders freely and apparently entirely willingly accepted this price. The Chairman of the Bondholders Committee, Mr. Nye, stated in open court that his Committee considered it a fair price; and Mr. Wilhide, a prominent Baltimore banker and member of the Committee, again testified at the recent hearing in this court to the same effect. The record also shows that about the same time or shortly later, Mr. Simpson, the president of the G. F. & A. also bought 5% of the bond issue at a price of about $800 per bond. It is true that the face value of the legal claim of each bond, with accumulated and unpaid interest, now amounts to a little more than $2,000 per bond; but there is no affirmative evidence in the case that these bonds are now presently worth more than approximately the amount of the purchase in February 1944.

A very material assumption of fact in the argument now being considered is that there is presently real value in the first preferred stock of the G. F. & A. I will discuss this only for the bearing that it may have here and now on this particular argument. The special master's report in the case found there was no value in the G. F. & A. stocks. As a result of the hearing on exceptions to the plan, this court reached the same conclusion. There is no evidence of any change in this situation except from the present tentative operating credit which is potential and not actual, and, according to the evidence, probably only temporary and not permanent. The evidence shows that the G. F. & A. has in normal times little, if any net earning capacity. Its own local traffic gross revenues declined in 1940 to $515,000 from $1,230,392 in 1928. As a minor link in the Seaboard System it has been used principally as a "bridge" route connecting with other Seaboard Lines. That is to say, there is comparatively little traffic originating on the G. F. & A. More than 60% of its earnings in recent years has resulted from foreign traffic solicited by the Seaboard and brought to the G. F. & A. on one of its lines and delivered by the G. F. & A. to another Seaboard line. And the greater volume of this since 1940 has been due to abnormal war conditions. As Receiver Powell testified, the Seaboard can continue to use the G. F. & A. as a part of its System but it is not regarded as of large value. Another important factor in any appraisal of the present value of the G. F. & A. is the undisputed fact that for its continued operation it requires physical betterments to be made as soon as possible at a cost of at least $1,300,000. Messrs. Simpson and Borer bought $1,000,000 par value of its first preferred stock in 1943 for $5,000. Under these conditions it is difficult to find any substantial value in the preferred stock of the G. F. & A.

The final assumption of the argument is that the Seaboard creditors are planning oppressive legal action against the G. F. & A. I do not think the facts warrant this view. It is not even suggested that the G. F. & A. bonds were not legally enforce-

able to the amount of their principal and unpaid interest against the G. F. & A. prior to their sale by the Nye Committee. Their purchase by the Seaboard Reorganization Committee imposed no greater burden on the G. F. & A. than previously existed. The purchasers succeeded to the vendors' rights. There is certainly no infirmity of title in the purchasers with respect to the vendors who have never made any complaint as to the fairness of the transaction. They have not been harmed by the sale and neither have the G. F. & A. stockholders. In this respect the situation has not been changed at all. Of course if the present tentative operating balance in favor of the G. F. & A. were now a free asset applicable to retirement of the principal or the payment of accumulated dividends on the preferred stock, that would obviously inure to the very great profit of the stockholders as compared with their capital outlay on their purchase. But that situation does not exist. It may also be true that if in the reorganization of the G. F. & A. its bonds held by the Seaboard creditors are not to be recognized for more than their cost plus interest, it is possible that may inure to the benefit and profit of the present stockholders. But that is not the question now before this court. The present question is whether this court should now hold that there is any equity in the situation which justifies or requires a present declaration that the title of the Seaboard creditors to the G. F. & A. Bonds is a limited and partial one only. Or, in other words, do the facts require this court to say that senior securityholders must be restrained from making a profit, if there is one ultimately to be realized on their purchase, for the benefit of creating a profit for junior securityholders. I find from the facts that no such equity does exist.

Since the hearing in this case, the Circuit Court of Appeals for the Fifth Circuit, has decided the Seaboard-All Florida Lines Case (Godfrey v. Powell & Anderson, Receivers of Seaboard), 150 F.2d 486. One of the questions decided in that case has a close similarity to the instant one. Prior to the Seaboard receivership in December 1930, the Seaboard Air Line Railway Company was the lessee of the All Florida Lines. The Seaboard Receivers disaffirmed the lease but continued operating the property under operating orders which provided in substance that the Re-

ceivers were not to be liable to pay over net earnings, if any, and the All Florida Lines should not be liable for deficits, if any, unless the operating orders were modified by the court. In 1942 to simplify and expedite reorganization of the Seaboard and to preserve the unity of the Seaboard System, Judge Way authorized the Receivers to purchase at $160 per $1,000 bond, all the bonds that might be offered for sale at that price, which at the time, was a fair price. Pursuant thereto the Receivers did purchase $24,543,000 par value of the issue of $33,505,000 of bonds. The funds used for the purchase were those in possession of the Receivers resulting from the general operation of the Seaboard System and were then subject to the lien of Receivers certificates and the impounding orders in favor of Seaboard mortgage creditors.

The special master's reorganization report in the Seaboard case in this court made no allocation of new securities to the All Florida Lines, noting that it was proposed to acquire them in the reorganization through foreclosure of the mortgage. In the mortgage foreclosure proceedings of the All Florida Lines in the Florida Court, and in the ancillary receivership proceedings in that court, other bondholders contended that the bonds held by the Receivers should be subordinated to their claims or at least limited in participation to the amount paid for them, basing their contention on the so-called "instrumentality" rule. They had filed motions for both the retrospective and prospective modification of the operating orders, contending that although there had been deficits in operation in prior years the increased earnings during recent war years, had overcome the deficits and showed a substantial surplus of earnings and that therefore the purchase of the bonds by the Receivers should be considered as really having been made from moneys derived from the operation of the All Florida Lines. District Judge Akerman denied a retrospective modification of the operating orders and in the mortgage foreclosure case held that the Receivers bonds were entitled to participate in distribution at the mortgage foreclosure sale, which had been made to the newly created reorganized Seaboard Railway Company at the established upset price, for their full face value and were not limited to the amount for which they were purchased.

On appeal these orders were affirmed. In the opinion by Circuit Judge Hutcheson, it was said, after referring to the instrumentality rule:

"The principle invoked is not applicable, for the bonds were not bought with All Florida funds nor with funds belonging to Seaboard, nor under its control. They were bought with funds of security-holders of Seaboard under orders directly authorizing the purchase and with results contemplated and provided for in the orders. No applicable, legal, or equitable principle called to our attention or known to us supports the theory of appellants that in some way an injury has been done to the holders of bonds, who were unwilling to sell, by the purchase of bonds from others, who were willing to sell. The record contains no evidence which, if the theory were sound in law, would support it in fact. The funds which were used to purchase the bonds were funds belonging to creditors of Seaboard, they were not Seaboard funds, nor were they funds in which All Florida bondholders had any interest. * * * Appellants' claim that their bonds should be in effect paid in full would, if allowed, have the result of unjustly enriching the holders of the bonds who declined to sell at the expense of persons who bought from those who were willing to sell, expecting to succeed to their places."

In the orderly and harmonious functioning of the federal judicial system cases sometimes arise in which careful consideration must be given to avoid conflicts of jurisdiction between courts of equal dignity but different territorial jurisdiction. This is such a case. The title to the G. F. & A. bonds is being tried in this court as the jurisdiction over them is here. This has been carefully recognized by the Georgia Court. And it is appropriate for this court now to expressly recognize, as it does, that the Georgia Court has the full jurisdiction of the subject matter of the reorganization of the G. F. & A. under section 77 of the Bankruptcy Act, including therein, of course, any and all questions that may arise affecting the proper treatment of the G. F. & A. bonds, in accordance with the provisions of the Act.

I conclude that the title to these Georgia, Florida & Alabama Bonds is vested in the Seaboard Reorganization Committee free of any equity, claim or lien thereon in favor of the trustees of the Georgia, Florida & Alabama, and have signed an order to that effect.